IN THE MATTER OF DANIEL J. SCAVONE, AN ATTORNEY-AT-LAW.

Argued March 17, 1987—Decided May 6, 1987.

*Collette A. Coolbaugh,* Executive Counsel, argued the cause on behalf of Disciplinary Review Board.

*Morris M. Schnitzer* argued the cause for respondent.

PER CURIAM.

This matter comes to us on the recommendation of the Disciplinary Review Board (DRB) that the license to practice law of respondent, Daniel J. Scavone, be revoked. When respondent applied for admission to the bar, he misrepresented to the Committee on Character (Committee) in an answered questionnaire that he had not been "disciplined, reprimanded, suspended, expelled or asked to resign from any educational institution."

Apparently, the Committee staff had misplaced the law school certificate known as Form # 3 that is part of the application for admission to the bar. The law school, St. Louis University, had completed the form by answering "Yes" to question two: "Was this individual the subject of disciplinary action, hearings, suspension, or was there any other factor which would pertain to this individual's fitness to practice law?" Through an oversight, the Committee certified that respondent was fit to be admitted to the bar, and he was admitted on December 20, 1984.

Thereafter, the facts came to light, and the matter was presented to this Court. We remanded it to the Committee, which conducted a hearing, at which respondent was represented by counsel. The Committee concluded that respondent should be sanctioned but did "not recommend any particular sanction in view of the fact that such a recommendation is not within this Committee's jurisdiction." The Committee forwarded its report to the DRB, which conducted a second hearing at which respondent was also represented by counsel. The DRB recommended "that respondent's license to practice law be immediately revoked." We agree.

I

The DRB summarized the facts as they were developed before it and the Committee:

Before graduating from Rutgers University in May 1979, respondent twice took the Law School Aptitude Test (LSAT). He received scores of 564 and 539. Respondent was disappointed, realizing that these test scores would not permit him to attend the law school of his choice. Respondent had graduated from college with high honors and viewed those low scores as his "first major failure." Knowing that the test scores of minority students were oftentimes overlooked in favor of other factors, respondent applied to the University of Pennsylvania Law School (Pennsylvania) as a minority student. He also applied to other law schools, including Georgetown University and Rutgers University. He was accepted by all three law schools. He chose to attend Pennsylvania.

While a law student, he was never questioned about his application. He did nothing to foster the idea that he was a minority student. Respondent attained average grades throughout his first year, this being the first time in his

academic career that he was not near the top of his class. Respondent found it difficult to obtain a law related summer job after his first year at law school.

During his second year at law school, respondent learned that a few students had verbally misrepresented to interviewers their past accomplishments or future intentions. An acquaintance of respondent's told him what respondent thought was a full-proof method of altering a law school transcript. Respondent altered his transcript to show that in his first year he received three "Excellents" and five "Goods" whereas his true grades were two "Goods" and six "Qualifieds." He submitted the altered transcript to two New York law firms which were engaged in on-campus recruiting. Respondent also falsified his resume by indicating that he received a score of 705 on the LSAT whereas he had only received 564 and 539. He submitted the altered resume during the on-campus recruiting to a New York law firm.

The law school administration discovered respondent's misrepresentations and gave him a choice to either withdraw or face expulsion. Respondent signed an agreement with the law school on October 31, 1980 which provided in part that he "in consideration of the Law School of the University of Pennsylvania's [sic] refraining from bringing a Disciplinary Proceeding against me, agree[s] to withdraw from the Law School on December 19, 1980." That agreement further provided that if respondent failed to withdraw or delayed his withdrawal, the law school would immediately convene a disciplinary committee to hear charges against him. The express charges in that agreement were that he had knowingly and deliberately falsified his admission application indicating he was a minority student, and that he had altered his transcript and falsified his resume which he submitted to law firms recruiting on-campus. This agreement with the law school was negotiated by respondent's attorney and not directly by himself. However, respondent indicated he clearly understood the meaning and nature of the agreement.

During the Fall of 1981, respondent wanted to return to law school and told a close family friend, who was an attorney in St. Louis, Missouri, the full story of his leaving Pennsylvania. That attorney discussed respondent's situation with the St. Louis University School of Law (St. Louis) administration and then suggested to respondent that he apply to that school. Respondent graduated from St. Louis in May 1984. He applied for admission to the bar of this state and was sent the Certified Statement of Candidate, Form 2-a, which informed the candidate that

## [IMPORTANT INSTRUCTIONS TO CANDIDATE:]

This Statement is intended to provide the Committee on Character with information relevant to your fitness to practice law. Candor and truthfulness are significant elements of such fitness. You should, therefore, provide the Committee with all available information, however unfavorable, even if its relevance is in doubt. Disclosure must be as detailed as possible. FAILURE TO DISCLOSE REQUESTED INFORMATION WILL RESULT IN CERTIFICATION BEING WITHHELD.

Included among the various questions was the following:

Have you ever been disciplined, reprimanded, suspended, expelled or asked to resign from any educational institution? [question XIIA]

Respondent answered that question in the negative. He certified his answers were true and accurate to the best of his knowledge and belief, further stating he was aware that any willful misstatement could prejudice his admission to the bar and subject him to such penalties as provided by law. Respondent signed this statement on June 8, 1984. The Law School Certificate, Form 3 that was completed by St. Louis, dated June 1, 1984, answered in the affirmative the following question:

Was this individual the subject of disciplinary action, hearings, suspension, or was there any other factor which would pertain to this individual's fitness to practice law?

That form was forwarded to the Clerk of the Supreme Court of New Jersey by letter dated June 6, 1984 in which the law school dean stated in part:

... I believe that the circumstances surrounding his [respondent's] withdrawal from the University of Pennsylvania were an aberration from his normal character and that his character and conduct at Saint Louis University School of Law were above reproach.

This material had been received by the Committee on Character administrative office on June 11, 1984 but apparently was misplaced. Respondent was informed by the Committee on Character in late October 1984 that if the required information was not received, he would not be certified for admission to the bar. Respondent, by letter, requested the dean of St. Louis to send the material again. On October 22, 1984 the Committee on Character certified that respondent was fit to be a member of the bar. When respondent received word that he would be sworn in as a member of the bar, he assumed that the dean of St. Louis had sent in all the information. He was admitted to the bar of this state on December 20, 1984.

By letter dated February 7, 1985 respondent was informed by the office of the Committee on Character that a review of his bar admission file "has disclosed evidence that tends to show that you failed to provide the Supreme Court's Committee on Character with information that reflected adversely on your character." The letter added that the Supreme Court had remanded the matter to the committee for findings and conclusions on his conduct. At the Character Committee hearing respondent said he knew "to a moral certainty" that the information would be provided by St. Louis. Although he thought it was odd that he never heard from the committee about the Pennsylvania incident, he had no doubt that the information had been received because he was told by the committee his certification would be delayed until that information was received. Consequently, he did not contact the office to determine if, in fact, the material had been sent.

The Committee on Character conducted a hearing on April 22, 1985. Respondent insisted his negative answer to the question whether he had ever been disciplined, reprimanded, suspended, expelled, or asked to resign, was correct. He maintained that his was a voluntary withdrawal from Pennsylvania. He

acknowledged if he had not withdrawn from the school, the school would have commenced disciplinary action against him.

Respondent stated he had filled out the application and left that particular question blank for about two weeks. He discussed the matter with his family and, in particular, his brother who is an attorney. Respondent informed the Committee that this

... was a very difficult decision to make because I wanted to put down no, okay, but the one reason I wanted to put down yes, the only reason I wanted to put down yes was because I was positive, like I said, that I was going to be at a hearing like this and I figured, well, if I put down yes they are going to get the stuff from St. Louis and then they will see I put yes here so the question like that would never come up, they would never say to me, you know, you knew we were going to get it why did you put down no. In fact, the day before I had sent it in I had this typed up with yes in there and I said I'm putting yes down there. It shouldn't be yes, it should be no and I'm putting down no and when I talked to them about it I'll explain why it is no. It wasn't something I just went, you know, put it down and kept going. [citation omitted.]

Respondent insisted before the committee that his answer was not an effort to deceive the committee. Respondent stated that the reason he wanted to answer the question in the affirmative was "to appease the Committee on Character." He anticipated that the committee, having received the information from St. Louis, would then have conducted a hearing regarding his character. Respondent added that when he discussed this matter with his attorney (his brother), he advised respondent to answer the question affirmatively. Respondent said when he later told his attorney brother what he intended to do, he replied for respondent to do as he wanted. Since respondent was certain St. Louis would furnish the adverse information to New Jersey, he did not signal his answer to this question with an asterisk and a brief explanation.

Respondent stated when he submitted his application for admission to St. Louis he informed that school in detail about the Pennsylvania incident. He said he made the disclosure because he believed there was no other way that the law school would have received the information. Respondent believed that one of the purposes of the agreement he signed with Pennsylvania was to enable him to answer negatively a question such as the one at issue. Respondent explained Pennsylvania informed him that if he voluntarily withdrew from the school, the school would have no jurisdiction and the charges would be dropped. The agreement was to permit respondent to finish the semester but to leave immediately thereafter.

In a report dated August 14, 1986, the Committee on Character concluded respondent should be sanctioned and forwarded its report to the Board. The Committee noted:

Had the appropriate information relating to Mr. Scavone's law school educational history been furnished to the Committee on a timely basis, it is rather obvious that based on the admitted and extremely serious deceitful conduct committed while a University of Pennsylvania Law School student, it

would most likely have resulted in a recommendation against certification of his fitness to the Court absent a strong showing by Mr. Scavone of subsequent rehabilitation. [citation omitted.]

The committee found respondent fully realized that the request from Pennsylvania was tantamount to demanding his resignation from that school. The committee concluded respondent's negative answer "displayed a lack of fairness and candor in dealing with the courts under the circumstances." The committee said it was "troubled" by respondent's attitude in which he sought to defend his action.[1] The committee also found that respondent's

... reliance upon his belief that the Law School would provide the accurate information which he chose not to do only serves to reflect adversely upon his continuing duty to show good character. In this respect, sloughing that duty off on others while he felt he was being technically correct evidences bad character and, in turn, an unprofessional trait, whose design was to avert his

---

[1] In its recommendation, the DRB omitted part of the Committee's report that we find relevant to our decision:

We are convinced that Mr. Scavone fully realized that if he wasn't being asked to "resign" in the technical sense, the request from Pennsylvania was tantamount to demanding such action. In his explanatory statement to the University of St. Louis he said: "The Law School's position was clear—either I withdraw or most likely face expulsion". But, even if we were to disregard his attitude at the time when he answered the question in the negative, which obviously displayed a lack of fairness and candor in dealing with the courts under the circumstances, we are as troubled by his present attitude displayed before the Committee at the hearing at which time he continued steadfastly to defend his action. In this respect, having been concerned as to how to answer the question in 1984 for a period of two weeks, having then rejected his New Jersey attorney's advice to answer the question affirmatively, and to defend himself now before the Committee and to rely upon another party (in this case the University of Saint Louis Law School to furnish the truthful facts), displays a present lack of judgment and ability to be candid and truthful in a professional manner. In our view, especially in light of the aforequoted "Important Instructions to Candidate" should have required Mr. Scavone to provide all information no matter how unfavorable to the Committee on the form he personally was required to complete. A defense that a fairly detailed question did not precisely embrace his particular factual situation does not excuse a fundamental requirement that he be as truthful and candid as possible. We find no excusable conduct in not furnishing directly the true facts when he was in fact "permitted" rather than "asked to resign" from the University of Pennsylvania Law School. His reliance upon his belief that the Law School would provide the accurate information which he chose not to do only serves to reflect adversely upon his continuing duty to show good character.

personal obligation to be truthful and candid with the Court and the public. Cf. *RPC* 3.3(a)(5).

Mr. Scavone showed no remorse and did not indicate even to the slightest degree that if he were to answer that question again that he would have done it differently this time. We have doubts that Mr. Scavone has learned from his earlier troubles at the University of Pennsylvania. The admittedly improper acts committed there show a pattern of deceit prior to his admission to the University of Saint Louis. In his statement submitted to that institution, Mr. Scavone goes to great lengths to describe the effect of his "withdrawal" from Pennsylvania on himself, his family and his friends, and how he has learned his lesson by stating that: "... the best proof of rehabilitation, of course, will be performance, if given that chance." We view his lack of candor in his certified statement as only serving to continue that pattern of deceit rather than serving to accomplish a positive change. [citation omitted.]

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusion of the Committee on Character in finding respondent guilty of unethical conduct is fully supported by clear and convincing evidence.

In *Application of Matthews*, 94 *N.J.* 59 (1983), the Supreme Court noted that it

... has consistently held bar membership to be a privilege burdened with conditions. *In re Pennica*, 36 *N.J.* 401, 433 (1962). Among the most basic conditions precedent to bar admission are "good moral character, a capacity for fidelity to the interest of clients, and for fairness and candor in dealing with the courts." *Id.* at 434. This requirement was outlined in New Jersey well over a century ago, *On Application for Attorney's License*, 21 *N.J.L.* 345 (Sup.Ct.1848), and has remained an essential prerequisite for bar membership. Our current rules require "fitness to practice law," *R.* 1:25, and "good character," *R.* 1:27–1(a)(2). [*Id.* at 75.]

The Court noted in *In re Hyra*, 15 *N.J.* 252 (1954) that:

A full disclosure of one's personal life and his affairs should be made by every prospective candidate and it can be generally stated that there is no place in the law for a man who cannot, or will not, tell the truth even when his own interests are involved. In the legal profession particularly there must be reverence for truth. [*Id.* at 253–254.]

In *Hyra*, respondent did not disclose to the Union County Character and Fitness Committee before his admission to the bar his past criminal record. The question did not specifically ask about conviction of a crime. The Court held "there can be little doubt but that the respondent knew its implication." *Id.* at 254. By a 4–3 vote, the court majority imposed a two-year suspension but admonished the bar that

[t]his is the first disciplinary case of its kind which has come before us and our disposition of it must serve as a salutary warning to all future applicants

for admission to the bar. With this warning those transgressing in like manner can expect nothing short of disbarment. [*Id.* at 256.]

In *Higgins v. N.J. Bureau of Securities,* 100 *N.J.Super.* 266 (App.Div.1968), the court affirmed the revocation of the registration of a securities agent because his application for registration contained false and misleading statements in a material respect and his character was such that he was not qualified to be an agent. Higgins failed to state on his application his court martial convictions. This case is analogous to the case at hand. In *Higgins,* the court noted that the bureau chief who initially heard the case found

... appellant knew what the questions entailed but deliberately answered them falsely, hoping his army background would escape detection. [*Id.* at 274.]

The Board has carefully canvassed the record. It finds respondent's reasoning for not disclosing the required information to be without merit. If respondent wanted an airing of the incidents he could have answered the questions affirmatively with a statement that he wished to fully explain the matter at an interview or hearing. Instead he answered negatively, perhaps as in *Higgins,* with the hope that his background would escape detection.

The Board has great misgivings about respondent's perception of his conduct despite the proceedings before the Committee on Character and this Board. Particularly troubling was his response to the Board's inquiry as to his present thinking about the correctness of his application answers. When asked if he still believed his unqualified negative answer was correct and that any other response would only have been made to "appease" the committee, respondent stated

I'm not trying to cop out of your question, other than to state, with what I know now, and in the events that have happened to me, including my hearing before the Character Committee and this Committee, I would have answered yes to avert such hearings and gotten to the meat of my actions at the University of Pennsylvania. Do I think that the question was answered correctly? I do. Looking back at the time when I answered that question, I do believe that I answered the question the way I felt it should be answered. However, if, again, I could have foreseen the events that occurred afterwards, I would have possibly answered yes, or no with an explanation.

Board Chair: But, [the member's] question goes a little beyond that. What he's saying is, you believed then and you believe now, that the correct answer to the question was no, yet you considered over a two week period answering it yes.

Respondent: That's correct.

Board Chair: Which was not the correct answer in your judgment, to "appease" which I translate con, the Committee.

Respondent: That's correct.

Board Chair: Okay. That's what he's asking you. Would you still use that word?

Respondent: Yes.

Board Chair: In other words, had you answered it yes, that would have been the only reason?

Respondent: Yes.

Board Chair: To appease the Committee?

Respondent: Yes, sir. [citation omitted.]

We fear his intellectual sophistry and its effect upon the legal profession.

Respondent's actions at Pennsylvania, both in applying and in seeking employment, demonstrated a cavalier and self-centered approach toward the truth. Pennsylvania, as most other law schools, established special admission criteria for minority applicants so that the student population would better reflect the composition of the community which the university serves. Some genuine minority student might have been irreparably prejudiced by respondent's selfish act. Similarly he might have deprived a more qualified law school colleague of valuable job experience when he falsified his academic credentials in his quest for a summer clerkship.

When respondent appeared before the Committee on Character he petitioned for a character hearing *nunc pro tunc.* In argument before the Board, respondent renewed that issue. In his brief, respondent stated:

It is unacceptable to Mr. Scavone that he should benefit from a Character Committee processing of his application for admission to the bar, uninformed by the material twice provided by Form 3, as completed by the University of Saint Louis School of Law. [citation omitted.]

The Board finds respondent's action has demeaned the integrity of the law and has reflected unfavorably upon every honest member of and applicant for the bar. Respondent resorted to deceit to enter law school, obtain law-related employment while in school and now to enter a profession requiring the highest degree of character.

Under the circumstances of this case, the seven participating Board members unanimously recommend that respondent's license to practice law be immediately revoked. See *Florida Board of Bar Examiners v. Lerner,* 250 *So.*2d 852 (1971); *State Bar v. Langert* [43 *Cal.*2d 636], 276 *P.*2d 596 (Calif.1954); *In re Klein,* 242 *App.Div.* 494, 275 *N.Y.S.* 703, 704–705 (Sup.Ct.A.D.1934). Nothing short of this extreme sanction will repair the damage respondent has done. This will also caution future bar applicants of the need to be completely candid when seeking admission to this honorable profession.

The Board specifically has not recommended the ultimate sanction of disbarment. Given the facts of this case, the Board's conclusion is that he was never properly admitted. Whether this respondent will ever be able to demonstrate the qualities required of every member of the bar—"honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice," *In re Matthews, supra,* 94 *N.J.* at 77—is a question which the Committee on Character may ultimately have to decide. Based on this record, he clearly has not. Respondent entered the legal profession by subterfuge. He should be removed therefrom immediately.

## II

Our independent review of the record leads us to conclude that the factual findings of the DRB are correct, and we adopt them.

Both the DRB and respondent agree that respondent's license should be terminated. They disagree, however, whether it should be "revoked" because respondent provided a deceitful answer to question XII–A or "rescinded" because of a mutual mistake whether St. Louis University had informed the Committee that respondent had "resigned" from the University of Pennsylvania. Underlying that disagreement is their differing perceptions of the significance of respondent's negative answer to question XII–A that inquired, among other things, whether respondent had ever been asked to resign from a law school.

Respondent contends that he was not asked to resign from the University of Pennsylvania and, therefore, that he correctly answered question XII–A in the negative. He points out the difference between question XII–A and question two on Form 3. The distinction he draws is that question XII–A did not solicit from him a response about "any other factor" that would pertain to his "fitness to practice law." In our opinion, those distinctions bespeak respondent's continuing misunderstanding of the need for candor from lawyers, a need that is expressed in the "IMPORTANT INSTRUCTIONS TO CANDIDATE" in the application.

As the Committee found, respondent knew that if he "stayed there [at the University of Pennsylvania] there would be disciplinary proceedings brought against me * * *." In short, he knew he was facing probable expulsion. It was applicant's duty to assure that the Committee was informed about his deceitful conduct at the University of Pennsylvania, and he should not have relied on St. Louis University to provide that information. Although he persisted before the DRB in stating he was correct in answering "no" to question XII–A, he also acknowledged he would now answer "yes" or "no" with an

explanation. In fact, when he applied to St. Louis University, he answered a question substantially similar to XII–A in the negative with a supplemental answer. Although an affirmative answer or a negative one with an explanation would have alerted the Committee to the problems concerning respondent's application, we believe the appropriate response would have been for respondent to have stated affirmatively that he had been asked to resign. Such an answer is more consistent with respondent's acknowledgment that if he had remained at the University of Pennsylvania, he would have been disciplined for lying on his application for admission and for misrepresenting his grades and LSAT scores on his resume.

Our conclusion that respondent failed to disclose material facts to the Committee brings this case in line with prior decisions. *See Application of Jenkins*, 94 *N.J.* 458 (1983); *Application of Matthews, supra*, 94 *N.J.* 59. In *Jenkins*, the failure of a candidate to disclose material facts to the Committee led us to conclude that he was not fit to practice law. So it is in this case. Candor and honesty are a lawyer's stock and trade. Truth is not a matter of convenience. Sometimes lawyers may find it inconvenient, embarrassing, or even painful to tell the truth. Nowhere is this more important than when an applicant applies for admission to the bar.

"In all instances, the applicant must display complete candor in all filings and proceedings required by the Committee on Character." *Application of Matthews, supra*, 94 *N.J.* at 82. Anyone who does not grasp that fundamental proposition should not be a lawyer. As we wrote in *Matthews:*

> Accordingly, we conclude that a bar applicant must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice. These personal characteristics are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly. We also believe that applicants must demonstrate through the possession of such qualities of character the ability to adhere to the Disciplinary Rules governing the conduct of attorneys. These Rules embody basic ethical and professional precepts; they are fundamental norms that control the professional and personal behavior of those who as attorneys undertake to be officers of

> the court. These Rules reflect decades of tradition, experience and continuous careful consideration of the essential and indispensable ingredients that constitute the professional responsibility of attorneys. Adherence to these Rules is absolutely demanded of all members of the Bar.
>
> [*Id.* at 77–78.]

According to his testimony, applicant vacillated between answering question XII–A in the affirmative or in the negative. His older brother, a member of the New Jersey bar, advised him to answer in the affirmative. Yet, respondent decided to answer the question in the negative, a decision that he still defends. Viewed against the background of his deceitful conduct at the University of Pennsylvania, respondent's inability to tell the truth about himself demonstrates his lack of good moral character and his unfitness to practice law. *See Application of Jenkins, supra,* 94 *N.J.* at 458.

We do not know if respondent will ever be rehabilitated. Toward the end of the hearing before the DRB, however, respondent manifested some rudimentary grasp of the need for candor. He said that in working on securities matters,

> in meetings with attorneys who agree that technically disclosure is not necessary * * *. * * * I find myself more times than not, opting for disclosure of whatever fact we may be discussing, simply because, probably because part of what happened to me, I just feel that sometimes it's just better to let everything ride on the table than to get caught from behind where the focus becomes more of, you know, well, you tried to hide something from us rather than focusing on the issue.

We do not foreclose the possibility that at some time respondent may be able to demonstrate his fitness to practice law. *Application of Jenkins, supra,* 94 *N.J.* at 472. Such a demonstration must be sufficient to overcome the strong presumption of continuing unfitness caused by his lack of candor. *Ibid.; Application of Matthews, supra,* 94 *N.J.* at 83. Respondent's license to practice law is revoked without prejudice to his right to present to the Committee additional evidence concerning his rehabilitation. *Id.* at 84.

Respondent is to reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

*For revocation* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*Opposed*—None.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that DANIEL J. SCAVONE of WALDWICK, who was admitted to the Bar of this State in 1984, be disciplined, and good cause appearing;

It is ORDERED that DANIEL J. SCAVONE'S license to practice law be revoked, effective May 20, 1987; and it is further

ORDERED that effective May 20, 1987, DANIEL J. SCAVONE is restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics; and it is further

ORDERED that DANIEL J. SCAVONE reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.