608 A.2d 328

IN THE MATTER OF ROBERT T. NORTON,
AN ATTORNEY AT LAW.

IN THE MATTER OF RICHARD A. KRESS,
AN ATTORNEY-AT-LAW.

Argued May 4, 1992—Decided July 10, 1992.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Frederic K. Becker* argued the cause for respondent Robert T. Norton (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Becker* and *Christine D. Petruzzell,* of counsel; *Mr. Becker, Ms. Petruzzell,* and *James Sharkey,* on the brief).

*John P. McDonald* argued the cause for respondent Richard H. Kress (*McDonald, Rogers & Rizzolo*, attorneys).

PER CURIAM.

This is an attorney-disciplinary proceeding in which respondents, Robert T. Norton and Richard A. Kress, were found guilty of ethics violations for conduct contributing to an improper dismissal of a drunk-driving case. The municipal court dismissed the case after Kress, the municipal prosecuting attorney, told the court that the arresting officers did not want to proceed with it. Kress, apparently aware that the officers had improper reasons for not proceeding with the case, did not so inform the court.

Norton, who represented the DWI defendant, had contributed to the officers' decision not to proceed with the case against his client. Norton also had successfully moved to have the case transferred to a different municipal court where Kress, his former law partner, was the prosecutor.

Following ethics charges against respondents, the District Ethics Committee (DEC) found that they had violated the Rules of Professional Conduct, and recommended that they receive private reprimands.

A majority of the Disciplinary Review Board (DRB) agreed that respondents' conduct constituted ethics violations but recommended that Norton be suspended from the practice of law for six months and that Kress be suspended for three months. The DRB minority recommended that respondents receive public reprimands.

Our independent review of the record leads us to conclude that a three month suspension from the practice of law is the appropriate sanction for both respondents.

I

Respondents are both experienced attorneys. Norton was admitted to the New Jersey bar in 1972. For three-and-a-half

years before he went into private practice he was a public defender assigned to Union County, trying homicide, rape, and robbery cases. He currently is a partner in a law firm in Westfield, New Jersey.

Kress was admitted to the New Jersey bar in 1979. Since 1982 he has been the municipal prosecutor for Clark, New Jersey.

## A.

### Donnelly's Arrest

Respondents' ethical violations arose from the following events: On January 30, 1990, Westfield police officers Andrew Gallagher and David Luce arrested Westfield resident Joseph Donnelly, a New York attorney, who was returning home from dinner in New York. The police stopped Donnelly in front of his house. He was charged with three traffic violations: drunk driving in violation of *N.J.S.A.* 39:4-50, failure to stay within a single lane in violation of *N.J.S.A.* 39:4-88(b), and failure to obey a stop sign in violation of *N.J.S.A.* 39:4-144.

Donnelly told the officers that he had consumed a few drinks that evening at dinner. The officers then administered several balance and coordination tests. In his report, Officer Gallagher stated that Donnelly performed those tests poorly. According to Officer Gallagher, Donnelly repeated his poor performance at the police station, where his performance was videotaped. Gallagher, however, was wrong about Donnelly's videotaped performance. Gallagher's supervisor, Detective Lieutenant Bernard Tracy, testified that it was one of the best performances he had ever seen. That Donnelly's videotape standing alone would not have been sufficient to establish that Donnelly was intoxicated is now undisputed. After those tests, Officer Gallagher administered two breathalyzer tests to Donnelly. One test revealed a .16% blood-alcohol level, and the other .15%. Both levels were above the .10% level for intoxication.

At the police station Donnelly showed Officer Luce a 200 Club Card and asked whether showing it to the police officers earlier would have made a difference. Officer Luce gave a negative response but Officer Gallagher approached, looked at the card, and indicated that showing it would have made a difference. The 200 Club is an organization of businesspersons and professionals who support law-enforcement and fire services in New Jersey, and provide monetary support to the families of police officers and firefighters injured or killed in the line of duty.

Donnelly asked Norton, a close friend, to represent him. Norton agreed to defend him free of charge.

### B.

### *Norton's Meeting with Gallagher*

Shortly after Donnelly's arrest, Norton unsuccessfully attempted to communicate with Officer Gallagher. Eventually, Norton dropped in at the police station one evening and met Officer Gallagher. Neither Norton nor Gallagher was very specific about what had occurred at the meeting. Although the two did not know each other before their meeting, Gallagher described Norton as friendly. Norton told Gallagher that he was well-acquainted with many police officers. Detective Lieutenant Tracy's name arose during their conversation. Gallagher thought that Norton was a friend of Tracy, which he is. Norton admitted that he had asked Gallagher to give Donnelly "a break," and described Donnelly as "a fine citizen of Westfield and a substantial supporter of law enforcement with some other counties."

Gallagher testified that Norton had never requested that he drop the DWI charge against Donnelly. Norton explained that by asking Gallagher to give his client a "break," he was merely seeking minimal fines and merger of two of the traffic offenses.

During their conversation, Donnelly's contributions to the 200 Club were also mentioned; Gallagher and Norton disagree on who raised that topic. However, that Gallagher had known that Donnelly was a member of the 200 Club since the date of Donnelly's arrest is clear.

## C.

### *Norton's Transfer of the Case*

Donnelly's case was to be tried in Westfield Municipal Court. The next appropriate venue was Mountainside Municipal Court. Norton, however, after much effort, arranged for the case to be tried in Clark Township, where his former law partner, Kress, was the municipal court prosecutor. The first count of the DEC's complaint against Norton charges that he had arranged that transfer without full disclosure of all material facts, in violation of *RPC* 3.3(a)(1), 3.3(a)(5), 3.3(d), and 8.4(c).

Donnelly claims that he insisted that Norton transfer the case from Westfield and Mountainside because he and Judge Edward J. Hobbie, the municipal-court judge of Westfield, and Judge Robert A. Ruggiero, the municipal-court judge of Mountainside, were members of the same golf club and Donnelly did not wish to be embarrassed. He was very concerned about his reputation in the community. Moreover, Judge Hobbie's son and Donnelly's son played golf together. Donnelly insists that it was at his initiative that the change of venue take place.

Regardless of who initiated the transfer, Norton went to great lengths to arrange it. First, he telephoned the Clerk of the Westfield Court and requested that the matter not be heard in either Westfield or Mountainside because of the common golf memberships, but be transferred to Clark Municipal Court. Norton confirmed that request in a letter to the Westfield Clerk.

Approximately a week later Norton learned the case had not been transferred because Judge Hobbie saw no need for the

transfer. Norton then telephoned Judge Hobbie. Because Norton was concerned about Donnelly's desire to not suffer embarrassment, Judge Hobbie finally agreed to the transfer. He instructed the Clerk to transfer the matter to another municipality or list it in Westfield when he would not be sitting.

The Clerk then transferred the case to Clark Municipal Court. However, Clark was an inappropriate venue because pursuant to an order issued three-and-a-half years earlier, the appropriate venues in the event of disqualification of Westfield were in the following order: Mountainside, Springfield, and Plainfield. Norton was not aware of that order. The Westfield Clerk testified that she had suffered a "lapse of memory" when she reassigned the case to Clark. Although the transfer to Clark resulted ultimately from the Clerk's mistake, we note that Norton displayed a lack of candor by failing to inform either Judge Hobbie or Judge Ruggiero that Donnelly had been a defendant before the latter only a year earlier on a careless-driving charge. Norton claims his client was more embarrassed to appear before his fellow golf-club members on the DWI charge because it was more serious than the careless-driving charge.

The issue is whether Norton arranged the transfer to Clark so that his former partner, Kress, could prosecute the case. Kress was not involved in the transfer and was not charged with any ethics violations in connection with it. The DEC, however, charged both Kress and Norton with violations of *Rule* 1:15 and various opinions of the Advisory Committee on Professional Ethics (ACPE) because of their relationship as former "office associates."

## D.

### *Office–Associates Rule*

#### 1. Respondents' Partnership

On July 1, 1987, Norton and Kress, together with two other attorneys, Donald Hamilton and Jim DeRose, formed a partner-

ship to last for a one-year trial period. The new partners drafted an agreement to reflect that capital accounts were not to be merged but that the partners would work together for one year. After just a few months it became clear that the partnership would not work. Kress and Norton were at odds with each other. At the end of the year, they terminated the partnership. Norton and DeRose formed a partnership, and Kress and Hamilton became sole practitioners.

As evident from a memorandum from Norton to Kress dated July 19, 1988, the partnership dissolution was not friendly:

I recognize that the firm's dissolution has created harsh feelings, but as professionals, we should avoid discussing those differences or reasons for breaking up with clients.

When the partnership dissolved, the four former partners continued to occupy their respective offices in the same building. Kress subleased a portion of the second floor, paying rent of $510.96 month-to-month. He shared a secretarial area with Hamilton.

Although the former partners shared office space, they did everything they could to insure that they were neither partners nor office associates. Their offices were separate. The entrances to their offices were separate and their respective secretarial areas were separate. They employed separate personnel, letterhead, telephone numbers, malpractice insurance, files, accounts, and trust accounts. In addition, they had removed every sign with the former partnership's name on it except one.

However, Kress and his associate did have access to Norton's library, which they occasionally used as a conference room. Additionally, Norton used Kress's fax machine because although Kress owned the machine, the dedicated telephone lines belonged to Norton.

Respondents never held themselves out to be associated in any way. Kress's and Norton's brief partnership had ended on a bad note, under less than friendly circumstances. They did

not like each other. Indeed, after the breakup Norton and Kress rarely even spoke to each other. By the time of Donnelly's hearing, their hostility had subsided, but Kress testified that "they didn't go out of their way to do anything for each other." The month following Donnelly's hearing, Kress moved his office to Clark.

## 2. The Office–Associates Rule

New Jersey Court *Rule* 1:15–3(b) provides that a "municipal attorney * * * shall not represent any defendant in the municipal court thereof." That proscription also extends to "office associates" of municipal attorneys, including municipal prosecutors. *R.* 1:15–4. "Office associates" include attorneys who share common office facilities. *R.* 1:15–5(b). Moreover, ACPE Opinion No. 74 held that a "conference room shared by two attorneys is an important office facility and comes within the definition" of *Rule* 1:15, thereby rendering the two attorneys "office associates."

Technically, therefore, respondents were "office associates" and Norton should not have represented Donnelly in the Clark Municipal Court because Kress was the municipal prosecutor there.

The DEC and indeed the Office of Attorney Ethics (OAE), recognizing the animosity that had existed between Kress and Norton at the termination of their partnership and the great lengths to which they had gone to keep their practices separate, treated respondents' violation of the office-associates rule as a minor violation, worthy at most of a private reprimand. They believed, and we agree, that respondents did not realize they were "office associates."

The discussion of the office-associates rule is important not because it demonstrates respondents' violation of that rule but because it reflects the relationship between Kress and Norton. Why a defense attorney deliberately would attempt to transfer a case to a municipal court to be prosecuted by a former

partner, who had recently left the partnership with harsh feelings is difficult to understand.

## E.

### *The Hearing*

Norton testified, and Kress agreed, that they had not discussed the Donnelly case with each other until late afternoon the day of the hearing. Norton "stuck his head into Kress's office" and told him that he would see him later that night on a DWI case. At that time Norton allowed Kress to review briefly the discovery materials that Norton had received from the police.

What happened next at the Clark Municipal Court was the focus of much of the testimony at the DEC hearing. Norton testified that early in the evening, he had spoken with Officers Luce and Gallagher at the courthouse. He told them that he was ready to try the case, commented about some problems with certifications of the breathalyzer results, and asked if they had brought the videotape with them. Although Gallagher had brought the videotape, he had not brought his breathalyzer operator certification or the radio interference frequencies. Kress contends that those facts indicate that the officers had never intended to prosecute Donnelly.

Both officers testified they then went to speak with Kress in his office. They testified that as Westfield police officers, they were not familiar with Clark Municipal Court proceedings. The officers therefore relied on Kress because he was Clark's municipal prosecutor. They claimed that Kress convinced them to dismiss the case. The DEC found that testimony to be "incredibly unbelievable." The officers also testified that Kress had shown them a certificate of breathalyzer analysis that Norton had faxed to him that afternoon. Norton was going to use that certificate to discredit Donnelly's breathalyzer results.

Kress's account of his conversation with the police officers is completely different. He testified that Officer Gallagher told

him that the police officers wanted to "give Donnelly a break" and asked him to find a reason to dismiss the drunk-driving charge. After reviewing discovery documents and checking the technical aspects of the breathalyzer checklist, Kress informed the officers that he saw absolutely no reason to dismiss Donnelly's case.

According to Kress's testimony, Norton then came to see him, and the police officers left. Norton then, for the first time, showed Kress the documents constituting his breathalyzer-analysis defense. Either at that time or later in the evening, Kress told Norton that he did not "buy into that defense." Norton recalled that Kress thought that the defense was "b.s." Norton then asked to review the Donnelly videotape.

After Norton left Kress's office, Kress went into the courtroom and disposed of a number of other municipal court cases. Officer Gallagher then again visited Kress in his office. Kress contends that the officer at that time showed him a copy of Norton's breathalyzer-analysis certificate. He claims he told Gallagher there was no merit in that defense, and permitting Donnelly's breathalyzer results to be questioned could jeopardize other DWI cases. During that discussion with Kress, Officer Gallagher made clear that he did not want to prosecute the DWI charge, explaining that Donnelly was a member and former president of the 200 Club, and that Donnelly had always been helpful to police officers. Kress reiterated that he could not agree to dismiss the charge. Officer Gallagher then asked Kress what would happen if he refused to testify or go forward with the case. Kress responded that he would not have a case with which he could proceed. Kress further stated that he did not know what the judge would do under those circumstances.

Thereafter, Kress spoke with the Clark Municipal Court judge. Kress informed the judge that he had a DWI case but that the officers did not want to proceed with it; Kress asked the judge what would happen if the officers refused to proceed with the case. The judge told Kress that if the officers

testified on the record that they did not wish to proceed with the DWI charge, he would dismiss the charge. Kress then informed Officer Gallagher that if the officers refused to proceed, the judge would dismiss the DWI charge; Officer Gallagher stated that he had no problem with that result.

The matter was then placed on the record in the Clark Municipal Court. A senior clerk transcriber from the county prosecutor's office later prepared a transcript. The following exchanges occurred between the judge (J), Robert Norton (RN), Richard Kress (RK), and Officer Gallagher (OG):

J: All right, Summons 868916, Joseph Donnelly, he's charged with passing through a stop sign, failure to stay in ... Summons 868917, failure to stay in a single line, um, charged with operating a motor vehicle under the influence of a alcoholic beverage [Summons 868915]. Counsellor, may I have your appearance?

RN: Yes, Robert C. Norton, on behalf of the defendant. Your Honor, at this time it is a plea of guilty to "9–16" and "9–17."

RK: Richard Kress, on behalf of the State as to the charges.

J: Yes.

RK: On Number 39450, the State will move to dismiss that charge.

J: Summons 868915?

RK: That's correct, Judge.

RK: And the reason for the ...

RK: *Judge, quite honestly the officers do not wish to proceed with the summons at this time.*

J: The arresting officer is that "Gallagher?"

RK: Yes, Your Honor.

J: *Okay. Officer Gallagher, you've heard the application made on behalf of the Prosecutor to have this matter dismissed based upon your request that you not proceed with the matter, is that correct?*

OG: *Yes, Your Honor.*

J: Very well, the application will be granted, Summons 868915 will be dismissed.

[Emphasis added.]

F.

*Officer Luce's Statement After the Hearing*

Detective Lieutenant Bernard Tracy of the Westfield Police Department, in an internal-investigation report dated May 2, 1990, stated:

On 4/10/90 during mid-morning hours this writer was in the hallway of the Westfield Police Department. While in the hallway I was approached by Off. David Luce, who I believe was on duty at that time. Officer Luce stated, *"I did a friend of yours a favor."* I replied, "Who?" He stated, "an attorney from Dudley Ave." I explained that I did not know any attorneys from Dudley Ave. and I asked what the attorney's name was. Officer Luce replied, "Donnelly, I think." I told Officer Luce I don't know anyone from town by that name and I think maybe this guy lied to you. *I asked Officer Luce what the favor was. He then explained that he and Officer Gallagher gave this guy a break for drunk driving.* I assumed that Officer Luce meant that they had stopped someone who appeared drunk and when this person stated that he was a friend of mine, they drove him home or made some other arrangements, to avoid arrest. \* \* \* *Detective Tracy stated that after his conversation Officer Luce appeared somewhat confused and concerned and discontinued the conversation.*

[Emphasis added.]

When Lieutenant Tracy learned that the drunk-driving charge against Donnelly had been dismissed, he reported his conversation with Luce to Westfield Police Chief Scutti and Westfield Police Captain Wheatley. At the DEC's request Lieutenant Tracy testified at Norton's and Kress's hearing. Lieutenant Tracy's testimony substantially tracked what he had stated in his internal-investigation report. We note that although at the DEC hearing Luce testified that the charge was dropped at Kress's suggestion, he did not mention that when he spoke to Lieutenant Tracy two weeks after the incident.

In testifying before the DEC Lieutenant Tracy attributed the dismissal of the ticket to Officer Gallagher's desire to help people who are friendly to the police. He stated: "Officer Gallagher, who has been involved in some disciplinary problems in the Westfield Police Department, has a way of supporting his brother officers and not necessarily being—doing what's proper and what's right because of his feeling for the brotherhood."

Lieutenant Tracy's testimony prompted the Westfield Police Department to order an investigation of Officers Gallagher and Luce. Officer Gallagher gave a statement to the investigators. The county prosecutor's office, which investigated the matter, determined that no criminal violations had occurred. The disciplinary hearings of Officers Gallagher and Luce have been held

in abeyance pending the result of the present disciplinary proceedings.

## II

The DEC relied on its conclusion about the credibility of the witnesses to reach its findings and recommendations. It properly placed little emphasis on respondents' technical violation of the office-associates rule, recognizing that respondents did not intend to violate the rule and did not realize that they had done so. The OAE agreed with the DEC on that issue.

Likewise, the DEC found that there was no clear and convincing evidence of impropriety in Norton's transfer of the case from Westfield to Clark.

Instead the DEC devoted its attention to the allegation that Donnelly's DWI charge had been improperly dismissed. The DEC found:

Therefore, in summary, it is the finding of this panel that there was no conspiracy for the improper dismissal of the DWI ticket. We do find that the dismissal of the ticket was improper; it was not a plea bargain, but was what was so eloquently referred to as a "dump." This "dump" could only be done with the active assistance of the police officers, and both were substantially less than believable in their testimony before the panel. The police were not prepared to try the case, nor had Respondent, Robert T. Norton, viewed the video tape or subpoenaed or brought witnesses to the trial. It appears Respondent, Robert T. Norton, knew the officers would dismiss the ticket upon arrival at court. We do not believe Respondent, Richard H. Kress, had any advance knowledge of this, and if the officers would have testified, we believe that Respondent, Richard H. Kress, would have presented the case.

While we are only reviewing or determining fault of the two Respondents in this hearing, the fact that the transferring judge, the court clerk, the two officers and the judge presiding at the DWI hearing all share in this improper dismissal of a DWI charge, does not go unnoticed by the panel. We would not place primary responsibility for what occurred improperly on the two respondents.

As the DEC appropriately noted, "In order for this dismissal to occur, it took five individuals to agree and a mistake by a court clerk." What is curious is that those persons, with the exception of Norton and Kress, did not know each other. Officers Gallagher and Luce did not know Donnelly or the

respondents. Officer Luce first met Norton at the hearing, and Officer Gallagher had met Norton just once, when Norton had visited him at the police station to discuss Donnelly's case. Kress did not know Donnelly or either officer.

Equally puzzling is the suggestion that Norton transferred the case to Clark so his former law partner, from whom he had recently and unamicably terminated a partnership, could prosecute the matter. Moreover, neither respondent knew which municipal-court judge would hear the DWI charge. The municipal-court judge of Clark, who had presided over Donnelly's hearing, had not been sitting for several weeks due to an accident. In his absence, another judge had presided over the Clark Municipal Court. Indeed, the night of Donnelly's hearing was the judge's first night back on the bench after his accident. The judge has since resigned.

There are no allegations of bribery or money changing hands. Indeed, Norton received no fee for representing Donnelly. The motivation for the police officers' refusal to proceed with that case for a defendant and a lawyer they did not know is unclear. The most likely explanation appears to be their desire to help someone they thought was friendly with Lieutenant Tracy, their supervisor, and someone who helps the police.

The DRB disagreed substantially with the DEC's conclusion that "the record does not support a finding that the DWI charge against Donnelly was dismissed as a result of a plea bargain." The DRB found it "unquestionable that both Norton and Kress participated in a scheme to have the DWI charge against Donnelly dismissed * * *. It is also unquestionable that both failed to advise the Clark court of their office association."

The DRB deemed Norton's conduct more egregious because of the manner in which he had transferred the case. Moreover, the DRB described Norton's conduct as providing the "impetus leading to the dismissal of the DWI charge by persuading the officers that they should give his client a break." The DRB

further emphasized that Norton had "failed to notify the Clark judge of his office association with Kress." It therefore recommended that Norton receive a longer suspension than Kress.

The DRB disagreed not only with the DEC's analysis of the facts but with the DEC's assessment of the credibility of the witnesses. Our reading of the record reveals many inconsistencies in the testimony. We agree generally with the DEC's analysis of the events, which is based primarily on its assessment of the witnesses' credibility.

Our independent review of the record satisfies us that the circumstances of this case taken as a whole warrant the conclusion that respondents' role in the dismissal of the DWI charge was improper and constituted unethical conduct.

We agree with respondents that their conduct was less egregious than the conduct of the respondents in *In re DeLucia* and *In re Terkowitz*, 76 *N.J.* 329, 387 *A.*2d 362 (1978), a case cited by the DRB to support its recommendation that respondents be suspended. In *DeLucia* and *Terkowitz* a municipal-court judge had dismissed a traffic violation after fraudulently stating that there had been a court hearing in which testimony had established a defense to the traffic violation. Defense counsel, Terkowitz, a former municipal-court judge, had attempted a cover-up by preparing a false affidavit and a false jurat. In another case cited by the DRB, *In re Weishoff*, 75 *N.J.* 326, 382 *A.*2d 632 (1978), a municipal prosecutor had a deputy clerk impersonate a defendant who had received a speeding ticket in order to facilitate a not-guilty disposition of the ticket. The DRB also cited *In re Spitalnick*, 63 *N.J.* 429, 308 *A.*2d 1 (1973), a case in which a municipal-court judge, acting as an attorney, made representations on behalf of a defendant to another municipal-court judge without regard to whether those representations were true in an effort to persuade that judge to find defendant not guilty.

We find those cases distinguishable. Neither respondent in the present case lied to the court. A case more analogous to

this one is *In re Whitmore,* 117 *N.J.* 472, 569 *A.*2d 252 (1990). Like this case, the respondent in *Whitmore,* a municipal prosecutor, failed to tell the court, when the case was called for trial, why the police officer who had administered the breathalyzer test and who was to testify in the DWI prosecution had left the courthouse. The officer had left after another officer, a friend of the DWI defendant, had spoken to him. *Id.* at 474, 569 *A.*2d 252. After their conversation, the testing officer asked the respondent if the case could be prosecuted without his testimony. The respondent told the officer that it could not. The respondent urged the officer to testify, but the officer left the courthouse before the case was called, informing a court attendant that he was on "convention leave."

Whitmore apparently knew why the testing officer wanted the DWI charges dismissed because in a prior conversation with the respondent, the officer had told him that the defendant hoped to attend the State Police Academy and that a conviction would prevent him from doing so.

When the case was called for trial, the respondent informed the court that he could not proceed because the officer was unavailable. When the court asked respondent why the officer was unavailable, he did not reply. Defense counsel moved that the judge dismiss the case.

On hearing defense counsel's request, the respondent said only, "There's really not much I can say in opposition to that considering that the testing officer is not available." *Id.* at 476, 569 *A.*2d 252. The court granted the motion to dismiss. *Id.* at 474, 569 *A.*2d 252.

Whitmore's lack of candor resulted in the inappropriate disposition of the drunk-driving citation. As a result of an investigation, a Grand Jury indicted Whitmore for official misconduct, tampering with a witness, and conspiracy to do both. He entered and successfully completed a pre-trial intervention (PTI) program. Neither respondent in this case has been indicted.

RPC 3.3(a)(5) states: "A lawyer shall not knowingly fail to disclose to the tribunal a material fact with the knowledge that the tribunal may tend to be misled by such failure." In *Whitmore* we held that

> when a municipal prosecutor becomes aware of an improper motive directly affecting the administration of justice on the part of a police officer in a case before the municipal court, which, if undisclosed, could mislead the court, *RPC* 3.3(a)(5), or could contribute to an improper or illegal result that benefits the witness, *RPC* 3.3(a)(2), the failure to disclose such information constitutes a violation of the Rules of Professional Conduct.

[117 *N.J.* at 478, 569 *A.*2d 252.]

Both respondents argue that their respective conduct is much less egregious than that of Whitmore. Kress correctly states that his responsibility as municipal prosecutor was to be candid with the court. According to Kress, his only obligation was to tell why he was asking that the DWI charge be dismissed. In response to the judge's inquiry Kress stated, "Judge, quite honestly the officers do not wish to proceed with the summons at this time."

Kress asserts that his response gave the judge sufficient justification to question the DWI dismissal and to question the officers about their motivation. Although that is true, when a municipal prosecutor makes an application of dismissal before a judge, that judge assumes that the prosecutor supports the application and that there are sufficient facts or law to support the dismissal. Moreover, the failure to disclose need not actually cause an improper disposition of the case; "it suffices if nondisclosure would 'tend to mislead' the court." *Id.* at 477, 569 *A.*2d 252.

We recognize that unlike the prosecutor in *Whitmore*, Kress explained more completely to the judge why he wanted the charges dismissed. Unlike Whitmore, who merely told the judge that the officer was unavailable and did not respond at all to the judge's question of why that was so, Kress told the judge that the officers did not wish to proceed. Although that

response was more complete than Whitmore's response, it was nonetheless inadequate.

Kress allowed the judge to dismiss the DWI charge merely because the police officers did not wish to pursue the case. Kress knew that the officers "dumped" the case for an improper reason. As municipal prosecutor, Kress, not the police officers, was in charge of prosecuting the case. At a minimum he should have emphasized that the case was a DWI case, informed the judge that he had a strong case, and had the officers testify about why they did not want to proceed.

Charges based on adequate evidence should not be dismissed without good cause. Regardless of the officers' testimony or the judge's inaction, the bottom line is that an allegedly-strong DWI case was dismissed for an improper reason. As a prosecutor, Kress bears some responsibility for that result.

■ Norton argues that his conduct is less egregious than Whitmore's because he did not lie to the court and all the actions he took were proper for a defense counsel. He admits that he initiated communication with Officer Gallagher, told him that his client was a "good guy" and a loyal supporter of the police, and asked Officer Gallagher to give Donnelly "a break." He also admits that he told Gallagher that he was friendly with police officers, among them Lieutenant Tracy. Norton asserts that every defense counsel wants to "gain the edge." He points out that absent threats, improper pressure, or bribes, none of which is present in this case, to ask the police to give the client a break is not improper. Nor is defense counsel's seeking the transfer of a case to another court improper. The officer did not have to give Donnelly a break; the judge did not have to transfer the case or dismiss the DWI charge; the prosecutor did not have to accept passively the officers' refusal to testify; and the clerk did not have to transfer the case to the wrong court.

Although Norton's assertions are true, he cannot escape responsibility for his actions, for they were instrumental in

causing Donnelly's case to be dismissed. We have no objection to defense counsel in preparing a municipal court case for trial to ask the municipal prosecutor's consent to speak to the arresting police officers to learn the facts surrounding his client's arrest. However, we rely on the integrity of the counsel to limit the discussion to the facts surrounding the arrest and not to use the session as an opportunity to suggest to the police officers that they "dump" the case, either by changing their testimony or by refusing to testify. Norton's asking the police officers to give his client "a break" was purposely ambiguous. That ambiguity cannot obscure that the only "break" the officers could give Donnelly was to "dump" his case.

That the police officers chose not to testify at Donnelly's hearing because of their perception that he was a loyal supporter of the police is highly probable. Being a member of the 200 Club or otherwise a friend of law enforcement does not entitle one to special treatment. All stand equal before the law.

Respondents, both experienced municipal-court attorneys, knew that the DWI charge had been improperly dismissed. As the OAE properly noted, respondents stood

> silent as the miscarriage of justice occurred before [their] eyes. Both lawyers knew that the judge had been misled or that he was making a colossal mistake due to his lack of accurate information about the case. Even though his client was the beneficiary of this miscarriage, Norton must have known that he could not ethically accept a victory won by these means.

We agree.

■ Every lawyer has a duty to be candid and forthright with the court. *In re McDonald,* 99 *N.J.* 78, 83, 491 *A.*2d 625 (1985). " 'Sometimes lawyers may find it inconvenient, embarrassing or even painful to tell the truth.' " *Whitmore, supra,* 117 *N.J.* at 478, 569 *A.*2d 252 (quoting *In re Scavone,* 106 *N.J.* 542, 553, 524 *A.*2d 813 (1987)). We understand that for a defense counsel to protest his client's good fortune in having a strong DWI charge dismissed is awkward. Nonetheless we have made clear that "an attorney's loyalty to a client can

never override the professional loyalty owed to the justice system." *In re Conway,* 107 *N.J.* 168, 181, 526 *A.*2d 658 (1987). In *Whitmore,* respondent received a public reprimand because the Court recognized "that he did not purposely or affirmatively attempt to subvert the administration of justice." 117 *N.J.* at 480, 569 *A.*2d 252. Respondents assert that because their acts were less egregious than Whitmore's, they should receive a lesser penalty than what Whitmore received.

Although neither respondent lied to the court, neither were they completely candid with the court. Their silence led to the improper disposition of a DWI charge, a dismissal that they both knew was wrong. Under such circumstances, an attorney has an ethical duty to advise the court of the possible miscarriage of justice. These respondents stood mute.

As we observed in *Whitmore, supra,* 117 *N.J.* at 478, 569 *A.*2d 252:

The Rule [*RPC* 3.3(a)(5)] does not permit an attorney who directly represents a party in a matter before a court to choose to become only a spectator to an unlawful scheme. The Rule does not countenance an attorney's acquiescence or even passivity in the face of improper actions by parties, witnesses, or others who can subvert the proper administration of justice. The Rule requires an attorney to disclose all material facts to the court if he or she has reason to believe the court may be misled by a failure to come forward. As the DEC concluded in this case, "Absolute candor coupled with an absolute duty to disclose no matter how painful is required."

In deciding what sanction is appropriate, we must consider all the relevant circumstances. We recognize that respondents have been members of the bar for many years, have never been disciplined before, and that their ethics violations arose out of one incident. We also recognize that respondents were not alone in acting improperly nor were they entirely responsible for the dismissal of the charge. The police officers and the judge also acted improperly and should share blame for the result. However, respondents' actions resulted in a DWI charge being improperly dismissed.

We perceive no distinction in terms of culpability between the two respondents. Each in his own way was responsible for the

dismissal of the DWI case. We conclude therefore that both respondents should be suspended from the practice of law for three months.

Respondents shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

For Suspension—CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

Chief Justice WILENTZ, J., did not participate.

## ORDER

It is ORDERED that ROBERT T. NORTON of WESTFIELD, who was admitted to the bar of this State in 1972, is hereby suspended for a period of three months, effective August 1, 1992, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

WITNESS, the Honorable Robert L. Clifford, Presiding Justice, at Trenton, this 10th day of July, 1992.

## ORDER

It is ORDERED that RICHARD A. KRESS of RAHWAY, who was admitted to the bar of this State in 1979, is hereby suspended for a period of three months, effective August 1, 1992, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

WITNESS, the Honorable Robert L. Clifford, Presiding Justice, at Trenton, this 10th day of July, 1992.