779 So.2d 715 (2001)
Alfreda Tillman BESTER
v.
LOUISIANA SUPREME COURT COMMITTEE ON BAR ADMISSIONS.
No. 2000-OB-1360.
Supreme Court of Louisiana.
February 21, 2001.
*716 Alfreda Tillman Bester, Baton Rouge, Counsel for Applicant.
Clifton O. Bingham, Jr., Harry J. Phillips, Jr., Richard P. Ieyoub, Attorney General, Richard A Sherburne, Jr., Baton Rouge, Daniel A. Webb, New Orleans, Counsel for Respondent.
TRAYLOR, J.[*]
The petitioner, Alfreda Tillman Bester, seeks to compel the Committee on Bar Admissions, a body of lawyers created to assist this Court in its constitutionally mandated function of deciding who should be admitted to the practice of law in Louisiana, to produce her "conditionally failed" February, 2000 Bar Examination, as well as "model answers" or "grading guidelines" prepared by the members of the Committee on Bar Admissions. This demand squarely implicates our inherent authority to regulate all facets of the practice of law in Louisiana, including the admission of persons to the Bar. Because we exercise plenary, inherent authority in the area of bar admissions, and because at the time the subject bar examination was administered, bar applicants had no right to review their bar examinations, or any right to review the grading guidelines or model answers prepared by Committee Examiners, we deny relief.

*717 Facts

The petitioner was notified by the Committee on Bar Admissions that she had conditionally failed the February, 2000 Louisiana State Bar Examination. The petitioner then forwarded a written public records request, asking to view her own bar examination, together with the Committee's model answers/grading guidelines. The Committee on Bar Admissions, acting through counsel, denied the petitioner's request. Petitioner then invoked the original jurisdiction of this Court by filing a "Petition for Writ of Mandamus, Injunctive Relief and Declaratory Relief ..." seeking to compel release of the subject bar examination and Committee grading papers. The Committee on Bar Admissions answered the petition, arguing, inter alia, that Ms. Bester is not entitled to the information she requests.

Sources of this Court's Inherent Authority
Governmental power in Louisiana is shared by three separate branches of government, as Article II, § 1 of the 1974 Louisiana Constitution provides:
The powers of government of the state are divided into three separate branches: legislative, executive, and judicial.
The constitutionally mandated separation of governmental power places limitations on the authority of each branch as respects the power of the others. In this regard, Article II, § 2 of the 1974 Louisiana Constitution states:
Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.
The Supreme Court of Louisiana is the head of the judicial branch of state government, and the Chief Justice is the chief administrative officer of Louisiana's judicial system, subject to rules adopted by this Court. 1974 La. Const., Art. V, §§ 1, 3, 5 and 6.
This trichotomous branching of authority furnishes the basis for the existence of an inherent judicial power which the legislative and executive branches cannot abridge. Twenty-First Judicial District Court v. State, 548 So.2d 1208, 1209 (La.1989); Konrad v. Jefferson Parish Council, 520 So.2d 393, 397 (La.1988); Singer, Hutner, Levine, Seeman, & Stuart v. LSBA, 378 So.2d 423, 426 (La.1979). Since the Supreme Court is the head of Louisiana's judicial system, it is the final arbiter of the exercise of inherent judicial power. Twenty-First Judicial District Court v. State, 548 So.2d at 1209. Inherent power confers upon courts the authority to do all things reasonably necessary for the exercise of their functions as courts. In re Bar Exam Class Action, 99-2880 (La.2/18/2000), 752 So.2d 159, 160; Konrad, 520 So.2d at 397. The judiciary's inherent power is a necessary concomitant to the judicial power, but pertains to the administration of the business of the courts. In Re Bar Exam Class Action, 752 So.2d at 160; Konrad, 520 So.2d at 397. The inherent powers doctrine exists "because it is essential to the survival of the judiciary as an independent branch of government." Konrad, 520 So.2d at 397. (borrowing citation omitted).
This Court has exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the Bar. In Re Bar Exam Class Action, 752 So.2d at 160; Succession of Wallace, 574 So.2d 348, 350 (La.1991); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934).[1] The sources of this power are "this court's inherent judicial power emanating from the constitutional separation of powers ... the traditional inherent and essential function of attorneys as officers of the courts ... and this court's exclusive original jurisdiction of attorney disciplinary proceedings." Wallace, *718 574 So.2d at 350. (borrowing citations omitted).
In Ex parte Steckler, 179 La. 410, 154 So. 41 (1934), we were called upon to decide the right of two university graduates to practice law without having to pass the bar examination required by 1924 La. Acts 113 and rules of this Court. We ultimately held the graduates could not be licensed to practice without passing the Bar Examination. We noted:
The power to prescribe ultimately the qualifications for admission to the bar belongs to the judicial department of the government of the state. And each of the three departments of the state government is forbidden to exercise any power properly belonging to either of the others.
* * *
The inherent power of the Supreme Court to admit or disbar attorneys at law may be aided and regulated by statute, but it cannot be thereby frustrated or destroyed. Id., 154 So. at 44-45 (borrowing citation omitted).
The plenary nature of this Court's authority operates as a check on the Legislature's authority. Accordingly, the Legislature "cannot enact laws defining or regulating the practice of law in any aspect without this court's approval or acquiescence because that power properly belongs to this court and is reserved for it by the constitutional separation of powers." Wallace, 574 So.2d at 350; 1974 La. Const., Art. II. The inherent judicial power may be aided by the legislative and executive branches, but their acts or failure to act cannot destroy, frustrate, or impede the court's inherent constitutional authority. State in Interest of Johnson, 475 So.2d 340, 342 (La.1985); Singer, Hutner, Levine, Seeman, & Stuart v. LSBA, 378 So.2d 423, 426 (La.1979); Ex Parte Steckler, 154 So. at 45.

Legislative Recognition of this Court's Authority over Bar Admissions
The Louisiana Legislature has specifically recognized this Court's authority to regulate bar admissions. Some 77 years ago, the Legislature, in an effort to "promote legal education by requiring better qualifications of candidates for admission to the Bar ..." called upon this Court to establish procedures for examining the competence of persons to practice law. 1924 La. Acts 113. In that Act, the Legislature provided:
Be it enacted by the Legislature of Louisiana, That every applicant for admission to the Bar of this State, whether holding a diploma from a Law School or not, before being licensed to practice law shall be required to pass a satisfactory examination before the Committee of Bar Examiners of the Supreme Court, on such subjects and under such rules and regulations as are now, or may hereafter be, prescribed by the Supreme Court ...
In 1940, the Louisiana Legislature passed legislation which recognized this Court's inherent authority to regulate the admission of persons to the practice of law and which specifically called upon this Court to exercise that authority. 1940 La. Acts 54. In 1940 La. Acts 54, the Legislature "memorialized" this Court to create the Louisiana State Bar Association. Section 3 of Act 54 provided:
That the Supreme Court is hereby memorialized to exercise its inherent powers by providing for the organization and regulation of the Louisiana State Bar Association; by providing rules and regulations concerning admissions to the Bar, the conduct and activities of the Association and its members; ... and by providing for the discipline, suspension or disbarment of its members.
On March 12, 1941, the Court acted in accordance with the Legislature's request and created the Louisiana State Bar Association. The Court adopted and promulgated the LSBA Articles of Incorporation *719 "as rules of this Court." Article XII of the original LSBA Articles of Incorporation governed bar admissions. Section 3 of Article XII provided:

Powers of Committee. Subject to the approval of the Supreme Court, and except as hereinafter provided, the Committee on Bar Admissions shall adopt, to govern the examinations, whatever rules and regulations it may deem expedient, including when and where examinations will be held and their duration.
The LSBA Articles of Incorporation included provisions concerning bar admissions until 1999, when the bar admissions rules were amended and placed in the rules of this Court. See now, La. Supreme Court Rule XVII.
Finally, two current laws offer additional statutory recognition of this Court's rulemaking and inherent authority. LSA R.S. 13:72 provides that "[t]he Supreme Court for a better administration of justice, may establish and enforce rules necessary to secure the regular and expeditious disposition of its business ..." In addition, La.Code Civ. Proc. Art. 191 provides:
Art. 191. Inherent judicial power
A court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law.

Relationship Between Public Records Law and Rules and Procedures Regarding Bar Admissions
The Louisiana Public Records Law is codified at LSA-R.S. 44:1, et seq. The public's right of access to public records also has a constitutional basis, as Article XII, Section 3 of the 1974 Louisiana Constitution states that "[n]o person shall be denied the right to observe the deliberations of public bodies and examine public documents, except in cases established by law." The definition section of the public records law does not purport to define the term "public documents" as used in Article XII, Sec. 3 of the Constitution, but rather, defines "public records" in expansive fashion. LSA-R.S. 44:1A(2).[2]
The public records law contains a number of exceptions which serve to protect the confidentiality of a variety of records. Among the exceptions are the following: R.S. 44:2 (records involving preliminary legislative investigations); R.S. 44:3 (certain records of prosecutive, investigative, and law enforcement agencies); R.S. 44:5 (non-financial records in the custody of the governor); R.S. 44:10 (documents and proceedings of the Judiciary Commission); R.S. 44:11 (certain personnel records); and R.S. 44:13 (certain library registration records). One statute contains 28 different categories of exemptions from disclosure, and addresses the records of a number of different agencies. LSA-R.S. 44:4. Of interest for the purposes of this case is R.S. 44:4(27), which was passed in the 2000 First Extraordinary Session of the Legislature. The exemption protects the confidentiality of testing instruments and answers used by the State Department of Education or the State Board of Elementary and Secondary Education. The law provides:
§ 4. Applicability
This Chapter shall not apply:
* * *
(27)(a) To any testing instrument used or to be used by the state Department of Education or the State Board of Elementary and Secondary Education to assess the performance of individual students, nor to any answers for such tests or any individual student scores on such tests.
(b) Nothing in Subparagraph (a) of this Paragraph shall prohibit any person authorized by policies adopted by the *720 state Department of Education or the State Board of Elementary and Secondary Education from having access to the test instrument, test answers, or any individual student scores on such tests as necessary for the performance of his duties and responsibilities, nor any parent or guardian of a child who has taken any such test from having access to or being provided the child's individual test scores.[3]
None of the exceptions contained in the public records law specifically apply to the records and documents maintained by the Supreme Court of Louisiana, or the bodies it creates to assist it in its constitutional functions.
The Legislature has also exempted from the scope of the public records law examination documents of other professional licensing boards. Certain examination documents administered by the State Board of Architectural Examiners are exempted from disclosure, as LSA-R.S. 37:147B provides:
* * *
Copies of board examinations and answers of applicants shall be maintained for one year. The board examinations and the answers of applicants shall be exempt from disclosure pursuant to the Public Records Law as provided for in R.S. 44:1 et seq.
A somewhat more limited exemption has been granted for examination documents administered by the Louisiana Professional Engineering and Land Surveying Board. LSA-R.S. 37:691B states:
* * *
All records maintained by the board in connection with disciplinary actions or its administration of examinations, including examinations, answer sheets, solutions, and grade sheets, together with all the background information involving personnel and employer references shall be deemed confidential and as such, exempt from the provisions of Chapter 1, Title 44 of the Louisiana Revised Statutes of 1950; however, any applicant shall have the right to examine examinations, answer sheets, and other documents relating and pertaining to any action taken by the board with regard to such applicant.
In addition to the specific statutory exemptions from disclosure contained in the public records law and elsewhere, the protection afforded by the constitution against invasions of privacy has been held to prevail over the public's right to know and thus protect certain employee performance evaluations from disclosure. Trahan v. Larivee, 365 So.2d 294 (La.App. 3rd Cir. 1978), writ denied, 366 So.2d 564 (La. 1979). The First Circuit Court of Appeal has also recognized a legislative exception to disclosure based upon the legislative privileges and immunities clause, Art. III, § 8 of the Constitution.[4] In Copsey v. Baer, 593 So.2d 685 (La.App. 1st Cir.1991), writ denied, 594 So.2d 876 (La.1992), the petitioners asked for copies of the work files of two state senators concerning two legislative bills. The First Circuit first found the legislative privileges and immunities clause is a "law" within the "except" provision of Article XII, § 3 of the Constitution. Id., 593 So.2d at 687.[5]
In holding the documents were not subject to disclosure, the First Circuit noted the privilege and immunities clause is rooted in the separation of powers doctrine:

*721 The privilege is rooted in the separation-of-powers doctrine. Its "`central role' ... is to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary...." The privilege extends to freedom of speech in the legislative forum; when members are acting within the "legitimate legislative sphere," the privilege is an absolute bar to interference....
In light of the above, we agree with counsel for the appellees that "[r]educed to its essentials, the Copseys' demand for legislative files in this case calls for an inquiry into the motivations behind the preparation and introduction of legislative instruments into the Louisiana Legislature, an inquiry that goes to the very core of the legislative process." Accordingly, we find that the files requested are legislative acts, exempt from the provisions of Louisiana's public records law, as "otherwise specifically provided by" La. Const. Article III, § 8. Id., 593 So.2d at 688-689 (Borrowing citations omitted).
The fact that the Legislature has not seen fit to grant this Court or the Committee on Bar Admissions the same or similar protection it has conferred upon other government agencies/examining bodies does not, however, mean that this Court is without authority to protect itself and its committees from being required to disclose sensitive examination documents. As we have noted, the inherent powers doctrine exists as a protective mechanism to ensure our independence as the head of a separate branch of state government.
We have affirmed on repeated occasions the laudable goals advanced by Article XII, Section 3 of the Constitution and the public records law. The right of the public to have access to public records is a fundamental right, guaranteed by the Constitution. See, Capital City Press v. East Baton Rouge Parish Metropolitan Council, 96-1979 (La.7/1/97), 696 So.2d 562, 564; Title Research Corp. v. Rausch, 450 So.2d 933, 936 (La.1984). We affirm those laudable goals of openness and access today. Nonetheless, we must also recognize our constitutional, inherent duty and responsibility to regulate all facets of the practice of law, including the admission of persons to the Bar Association. This authority must of necessity, and as a protective measure to ensure our independence, include the right to determine when and under what circumstances sensitive materials under our exclusive superintendency and control should be shielded from disclosure.
One simple example illustrates why the public records law cannot be applied literally to the administration of the Louisiana State Bar Examination. If the public records law applies without exception, any examinee could request either the Bar Examination questions or the Examiners' grading guidelines or model answers in advance of the actual examination, thus effectively destroying our right to determine the competency of persons who wish to become members of the Bar. As applied to the issues squarely before us, strict application of the public records law would impede and frustrate our authority, as it would require us to alter the regulatory scheme we have put in place to administer the Bar Examination. In order to ensure our independence, a power must exist to protect the processes and procedures we have approved to administer the Bar Examination. That power is our inherent authority.
We now hold that an additional, limited exception to public disclosure exists for documents we determine should remain confidential, in situations where we are exercising our inherent authority as the head of a separate and independent branch of state government. In exercising its sovereign rulemaking authority, a state supreme court occupies the same position as that of the state legislature. Lewis v. Louisiana State Bar Association, 792 F.2d 493, 497 (5th Cir.1986); citing, Bates v. *722 State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Thus, when we exercise our inherent rulemaking authority regarding bar admissions, we occupy a position not unlike that of the Legislature, and our decisions concerning the disclosure or non-disclosure of documents within our exclusive purview falls within the "except" provision of Article XII, § 3 of the Constitution.
As will be discussed further infra, this determination serves to shield from disclosure the Committee's model answers and grading guidelines, bar examinations,[6] and the Committee's processes for destroying examination papers, because in the process of exercising our inherent authority, we have acquiesced in and approved these procedures.[7]

Bar Examination Rules and Procedures
This Court has exercised its inherent authority by promulgating and approving a comprehensive regulatory scheme regarding bar admissions. La. S.Ct. Rule XVII.[8] Members of the Committee on Bar Admissions are appointed by this Court, must have been admitted to the practice of law for a minimum of five years, and must be members in good standing. La. S.Ct. Rule XVII, § 1(A). Assistant Examiners are appointed by the Court upon request of the Committee to assist in the grading process. La. S.Ct. Rule XVII, § 1(C). The Committee is specifically allowed to "adopt internal operating rules and procedures which shall be effective upon approval of the Court." La. S.Ct. Rule XVII, § 1(B).
The Committee has promulgated procedures by which examinees maintain their anonymity. Rule 5, Committee on Bar Admissions Internal Rules; Bar Examination Instructions and Information. The Committee's Assistant Examiner Handbook provides specific and comprehensive instructions to Assistant Examiners concerning how examination papers are to be graded in order to ensure uniformity and consistency in grading. Pp. 5-10, Assistant Examiner Handbook. Assistant Examiners are specifically instructed to keep confidential the grading criteria, as the handbook provides:
After all papers have been graded, each Assistant Examiner must return them to the Examiner, along with the completed grade sheets, questions and the model answers or other grading criteria. It is not the Examiner's responsibility to retrieve these materials from the Assistant Examiner. Do not return these materials through the regular mail, rather, use certified mail (return receipt requested), or a courier, or an overnight courier service, or make other delivery or pickup arrangements with the Examiner. Assistant Examiners should not keep copies of an examination paper, the grade sheet or the model answers, and should take all appropriate steps to protect the confidentiality of these materials during the time that they are entrusted to the Assistant Examiner. P. 6, Assistant Examiner Handbook.

The Handbook and the internal rules of the Committee contain specific procedures for minimizing the possibility of substantive errors in grading. Examination questions are prepared by the Committee member assigned to each examination subject. Rule 3, Committee on Bar Admissions *723 Internal Rules. Each failed examination paper receives at least two reviews. Examination papers are first graded by assistant examiners. Failing examination papers are then regraded by Committee Examiners. Pp. 5-10, Assistant Examiner Handbook. Examination papers the Committee Examiner grades as a failure are "preserved until the meeting of the Committee at which the master grade sheet is completed." Rule 6, Committee on Bar Admissions Internal Rules. The rules call for the destruction of examination papers after grading. Id.[9]
The procedures in place for administering the Bar Examination have been discussed in four largely unsuccessful federal challenges. In Singleton v. Louisiana State Bar Association, 413 F.Supp. 1092 (E.D.La.1976) the plaintiffs contended the criteria for grading bar examination papers and the absence of a post examination review procedure violated their due process and equal protection rights.[10] Principally because of the aforementioned internal regrading procedure and the liberal rules in place for retaking the bar examination, the procedures were found not to violate federal constitutional guarantees. The Court reviewed the bar examination procedures, and specifically commented upon the confidentiality of the grading criteria:
There are nine essay-type examinations, each prepared by an individual member of the Committee on Bar Admissions... The papers ... are distributed at random to assistant examiners who grade them according to written criteria set forth by the Committee members. There are general criteria used by assistant examiners on all papers as well as specific outlines of issues or model answers to individual questions supplied by the Committeeman examiner who prepared a particular question ...
The specific instructions prepared by the Committeeman examiner, for obvious reasons, are disclosed only to the assistant examiners grading the particular question for which they were prepared. Id., 413 F.Supp. at 1095.
The district court discussed at length the process in place then for regrading failed examinations and for ultimately destroying examination papers. Id., 413 F.Supp. at 1095-1100. The procedure of destroying examination papers following administration of the Bar Examination was also noted in another unsuccessful challenge to bar examination processes in 1971, wherein it was alleged, inter alia, that the Bar Examination was discriminatorily administered. Harris v. Louisiana State Supreme Court, 334 F.Supp. 1289, 1306 (E.D.La.1971).[11]
A number of reasons exist which justify protecting the confidentiality of the Examiners' grading guidelines or model answers, and for the procedures in place for destroying bar examinations. These reasons, singularly or collectively, are well within the scope of our inherent authority to embrace, and include the following:
(1) Ensuring the integrity of the Bar Examination and Admission process;[12]

*724 (2) Budgetary and space constraints;
(3) Eliminating the possibility that the "grading guidelines" or "model answers" will be misconstrued or misinterpreted;[13]
(4) Minimizing challenges and unwarranted criticism of grading decisions;[14]
(5) Ensuring the usability of examination questions in the future; and
(6) Helping ensure that future examinees have comprehensive knowledge of the subject areas being tested and do not simply memorize the Examiners' model answers or grading guidelines.
We are not unmindful of concerns which have been expressed regarding the absence of a post-examination review procedure. To that end, we adopted for the first time last year an interim Bar Examination review procedure.[15] The procedure allows failed applicants to review their failed examination answers and compare them with representative "good" answers. While we could have required Committee Examiners to divulge their grading guidelines, we decided not to do so. That determination was one well within our inherent authority to make.

Conclusion
The Legislature has specifically recognized our inherent authority to regulate bar admissions and, in fact, "memorialized" us to create the Louisiana State Bar Association and adopt rules and regulations concerning bar admissions. That we have done, through the exercise of our inherent authority, by promulgating bar admission rules and approving the Committee on Bar Admissions' processes and procedures. Our approval encompasses the confidentiality of model answers or grading guidelines, and prior to the Court's adoption of an interim review procedure for the July, 2000 Bar Examination, the absence of a review procedure, as well as the Committee's right to destroy bar examinations after the grades have been finalized.[16] This exercise of our inherent, plenary authority serves to except these documents and procedures from the scope of the public records law.
The interim Bar Examination review procedure did not apply to the February, 2000 Bar Examination. As a result, the procedure is not available to the petitioner. Nonetheless, should the petitioner wish to retake the Bar Examination subjects she conditionally failed, the review procedure would be available to her.
*725 Petition for Writ of Mandamus, Injunctive and Declaratory Relief DENIED.
CALOGERO, C.J., and JOHNSON, J., concur in part, dissent in part and assign reasons.
CALOGERO, C.J., concurring in part, dissenting in part.
I agree with the majority's conclusion that the Supreme Court has plenary, inherent authority to regulate all facets of the practice of law in Louisiana, including the admission of persons to the Bar. I also agree that the interim Bar Examination review procedure did not apply to petitioner's February 2000 Bar Examination. I dissent, however, from the majority's entire denial of relief to petitioner. While we may have no obligation, legal or otherwise, to allow petitioner Bester to review her February 2000 examination, I would in fact allow such review.
The exercise of our inherent and plenary authority to except bar examination documents and procedures from the scope of the public records law does not prohibit us from making select documents available for limited review for limited purposes. In fact, we did just that when we adopted the new Interim Bar Examination Review Procedure on June 28, 2000.
This Court recognized that review of a conditioned or failed bar examination can be beneficial to bar applicants in improving their performance in future reexaminations. Immediately prior to the July 2000 bar examination, with the concurrence of the Committee on Bar Admissions, the Court in its administrative capacity adopted an interim bar examination review procedure for the July 2000 and February 2001 bar examinations. This review procedure was subsequently extended by Order until February 1, 2002, covering the February 2001 and July 2001 Bar Examinations.
This interim bar examination procedure was adopted in part in recognition that a number of states, other than Louisiana, provide failing bar applicants with a postexamination opportunity to review either their failing papers or chosen "best papers." In adopting this interim procedure, the Court attempted to balance the competing interests of bar applicants, who expend a tremendous amount of time and resources to qualify for and prepare to take the bar examination and can benefit greatly from such a review, with the administrative logistics of a grading system coordinated by the Committee on Bar Admissions, which is composed of volunteer attorneys who also expend a tremendous amount of time and energy preparing, reviewing, grading and re-grading the bar examination.
At the time of its adoption, I believed that the limited review procedure was fair and helpful to bar applicants and did not pose an insurmountable administrative burden to the Committee on Bar Admissions. At this juncture, after reviewing the results of the July 2000 Bar Examination Review Procedure, it appears that my belief was correct. The review procedure has proven beneficial both to the bar applicant (as attested to in written comments received by the Committee on Bar Admissions) and to the Committee on Bar Admissions, which I understand has welcomed the comments and suggestions of the bar applicants concerning the bar examination grading and review process. Upon expiration of the interim Order, the Court will evaluate the procedure to determine if additional improvements might be warranted and/or whether this procedure should be extended or made permanent.
Considering that our interim bar examination review procedure has proven both beneficial to the bar applicants and workable for the Committee on Bar Admissions, I see no reason to deny petitioner Bester's request to review her February 2000 examination simply because we have the power to do so and simply because she took the bar exam four months before the review process went into effect.
*726 I further understand that the Committee on Bar Admissions has, for now, retained copies of all exams from the February 2000 exam, both passed and failed. For this reason, I would allow Ms. Bester, and any other applicant who conditioned or failed the February 2000 exam, to review their February 2000 examinations. I would not, however, require the Committee on Bar Admissions to go back and construct a composite representative "good answer", as is required under the present Interim Review procedure. Thus, I would contemplate that such review of any conditioned or failed February 2000 examinations would be without the ability to compare such examination to a "representative good answer", but would otherwise be within the same strictures and conditions as the present Interim Review Procedure.[1]
JOHNSON, J., Concurs in part and Dissents in part.
I join the majority in holding that bar examinations are not discoverable under the State's public records law. The legislature has clearly exempted from compelled disclosure all testing instruments used by the various Boards of Education and all other professional licensing boards. This court, as supervisor of the bar admissions process, has the inherent authority to regulate our testing process.
I respectfully dissent from the majority's conclusion that no review procedure is available to this applicant. Despite the Committee on Bar Admissions's right to destroy all examinations after the grading process has been finalized, in this instance, the committee preserved all examinations from February, 2000. Although a representative good answer has not been prepared for comparison, I would allow Ms. Bester to review her February 2000 Bar Examination under the guidelines established for our Interim Review Process.
NOTES
[*] James Gulotta, Associate Justice Pro Tempore, sitting for Lemmon, J.
[1] Plenary means "full, entire, complete, absolute, perfect, unqualified." Black's Law Dictionary, 6th Ed. (1990) (borrowing citation omitted).
[2] In fact, a literal reading of the definition of "public record" would expose virtually all of this Court's papers, including law clerk memoranda, draft opinions, and the most sensitive of our internal documents to public inspection.
[3] Thus, this exception generally protects the confidentiality of testing instruments, but allows parents access to their child's individual test scores. As will be discussed further infra, this Court adopted for the first time last year a similar procedure which allows failed bar applicants to review their failed bar examination answers and compare them with chosen "good" answers.
[4] That clause provides, in pertinent part, that "... [n]o member shall be questioned elsewhere for any speech in either house."
[5] As noted, Art. XII, § 3 allows citizens to inspect public documents "except in cases provided by law."
[6] Prior to our adoption of an interim Bar Examination review procedure for the July, 2000 Bar Examination, unsuccessful bar applicants were afforded no post-examination review rights.
[7] LSA-R.S. 44:36 generally requires that public records be maintained for at least three years. That provision, if applied literally to bar examination papers, would conflict with the policies we have approved for destroying bar examinations following the finalization of grading decisions.
[8] As noted, we also have for many years acquiesced in and approved the Committee on Bar Admissions' internal processes and procedures for administering the Bar Examination.
[9] As will be discussed further, as to failed examination papers for the July 2000, February 2001 and July 2001 Bar Examinations, the Internal Rules have been effectively amended by our adoption of an interim Bar Examination review procedure.
[10] Before bringing suit, the plaintiffs specifically "requested a hearing to review their examination papers." Singleton, 413 F.Supp. at 1094.
[11] See also, Lewis v. LSBA, 792 F.2d 493 (5th Cir.1986)(Challenge to rules requiring destruction of bar examination papers and permitting no more than three attempts to pass bar examination rendered moot by rule changes permitting unlimited reexamination); Brewer v. Wegmann, 691 F.2d 216 (5th Cir. 1982) (Procedure in place for destroying bar examinations after grading does not violate federal due process guarantees).
[12] In Dodrill v. Arkansas Democrat Co., 265 Ark. 628, 590 S.W.2d 840, 844, f.n. 7 (1979), the Court noted:

Application for and administration of the bar examination are not matters of public record. To preserve the integrity of the admission process these matters of necessity must be closely guarded and uncompromised by public dissemination.
[13] Part I of the Bar Examination consists of nine essay-type examinations in nine different subject areas. La. S.Ct. Rule XVII, § 7. As their name indicates, the grading criteria are "models" and "guidelines." Without making each Examiner available to explain to failed applicants how the criteria were used in a given examination, a distinct possibility exists that failed applicants will not understand how the criteria were applied to their particular examination. We decline to place such a potentially onerous and additional burden on our volunteer Examiners.
[14] In Harris, supra, the Court noted:

The graders and examiners perform an onerous, voluntary job. Their integrity has been attacked by baseless opinion and conclusional statements by the plaintiffs, but no shred of evidence has been offered to impugn that integrity. Id., 334 F.Supp. at 1310.
As noted, the Bar Admission rules already contain procedures for minimizing substantive grading errors.
[15] The interim Bar Examination review procedure was extended for the next two Bar Examinations by Order of this Court dated January 23, 2001.
[16] As noted, the time period for destroying failed examination papers has been amended through our adoption of an interim review procedure. The review procedure provides that failed examination papers may be destroyed at any time following the scheduled date of the next bar examination.
[1] The Order enacting the present Interim Review Procedure provides in part:

Applicants must complete their review before the close of each session. Applicants must sign a receipt for all examination booklets and representative answers received for review. Applicants will not be allowed to copy or remove any Part I failed examination or representative answers. No person other than the applicant will be allowed to review his/her failed examination booklets or representative answers. No person other than the applicant will be allowed to participate in the review. Applicants must return all examination booklets and representative answers to the monitor before being allowed to sign out....