874 So.2d 113 (2004)
In re Jerry Jackson STAMPS.
and In re Teresa Lynn Witt-Stamps.
No. 2003-B-2985.
Supreme Court of Louisiana.
April 14, 2004.
Rehearing Denied June 25, 2004.

*114 ATTORNEY DISCIPLINARY PROCEEDINGS.
PER CURIAM.
This attorney disciplinary proceeding arises from formal charges instituted by the Office of Disciplinary Counsel ("ODC") against respondents, Jerry Jackson Stamps and Teresa Lynn Witt-Stamps. Respondents are married and currently practice law together in the State of Louisiana.

UNDERLYING FACTS
Respondents graduated from law school in May 1998 and applied to take the Louisiana bar examination in the summer of 1998. Respondents failed to pass the bar examination at that time and began preparing to re-take the examination in February 1999.
In October 1998, while studying for the February 1999 examination, respondents learned that Gabrielee Locklear, an attorney licensed to practice in North Carolina, was advertising for law school graduates *115 or associates to work for him in connection with his personal injury law practice. After several telephone conversations, respondents traveled to North Carolina to meet with Mr. Locklear. Thereafter, Mr. Locklear, who knew respondents were not licensed to practice law in North Carolina, contacted respondents to invite them to join his practice.
Following this offer, respondents made additional trips to North Carolina to meet with Mr. Locklear. On December 20, 1998, they signed an employment contract with Mr. Locklear, which was to be effective on January 2, 1999. That contract provided:

Employee is hereby hired to perform services for Employer in the capacity of an Associate. In such practice, Employees' duties shall consist of the general practice of law consistent with the rules of law of the Supreme Court of North Carolina ... [and] while employed by Employer, Employees shall use their best efforts to provide legal counsel and service to customers in the following counties ... Employees fully and completely understand and accept their obligations under this Agreement... During the employment term, the parties will enter into partnership negotiations.... For all services rendered by Employees hereunder, Employees shall receive compensation in the amount of $36,000.00 per year per Employee plus ten percent of revenue generated by Employees.... [Emphasis added.]
On the same day they executed their employment contract with Mr. Locklear, Mr. Locklear notarized their applications to sit for the February 1999 Louisiana bar examination. The application to take the bar examination requested information concerning their employment history over the last ten years. Both respondents replied that they had been full time students during this period and did not mention their employment with Mr. Locklear.
Beginning in January 1999, respondents returned to North Carolina on numerous occasions and would stay for periods ranging from a few days to weeks. While it is unclear exactly what functions they performed for Mr. Locklear during this time, the record contains several pieces of evidence concerning their activities. In a letter written on Mr. Locklear's letterhead and dated March 12, 1999, Mrs. Stamps wrote to John Robinson, an insurance adjuster, indicating that "we have been retained by Mr. James D. Williams...." Mrs. Stamps signed the letter, which contained the signature line, "Lynn Stamps, Esq. For the Firm." In another letter, dated April 27, 1999, Mrs. Stamps wrote to the Sabella Chiropractic Clinic, a medical provider, again stating the firm had been retained by Mr. Williams. She signed the letter above the signature line, "Lynn Stamps, Esq." Upon negotiation of the settlement of Mr. Williams' personal injury claim, the insurer adjuster issued a check on May 13, 1999 in the amount of $7,000 made payable to Lynn Stamps as "attorney" for Mr. Williams.
The record also contains checks issued to Mr. or Mrs. Stamps during their employment with Mr. Locklear. Each of the checks was endorsed by Mr. or Mrs. Stamps. In all but one instance, the checks contain notations in the "memo" section indicating the funds were proceeds and/or fees from a client matter.[1]
*116 Respondents remained with Mr. Locklear's firm until April 1999, at which time Mrs. Stamps passed the Louisiana bar examination. Mrs. Stamps then opened her own law practice.
Mr. Stamps, who did not pass the February 1999 bar examination, applied to sit for the July 1999 examination. In his application to take that examination, he made no mention of his employment with Mr. Locklear. Eventually, Mr. Stamps was admitted to the bar in October 1999, and joined his wife's law practice.
Following respondents' departure from Mr. Locklear's firm, Mr. Stamps wrote letters to Mr. Locklear on behalf of himself and his wife seeking fees purportedly owed to respondents and Mr. Locklear by clients. The letters implied respondents worked on client matters and were still willing to handle the North Carolina cases.[2]
*117 Disciplinary Investigation
The North Carolina State Bar subsequently conducted a disciplinary investigation into Mr. Locklear's activities in that state. In connection with that investigation, Mr. Locklear stipulated that he split legal fees with Mr. and Mrs. Stamps.[3] The North Carolina State Bar then advised the ODC that Mr. and Mrs. Stamps may have engaged in the unauthorized practice of law in the State of North Carolina.[4]
The ODC took sworn statements from Mr. and Mrs. Stamps. Mrs. Stamps testified that although she signed an employment contract with Mr. Locklear in late 1998, the contract never went into effect because Mr. Locklear advised her he could not pay her. Mrs. Stamps testified she performed some "paralegal/law clerk work" for Mr. Locklear on occasion, but denied ever discussing cases with clients or accepting money from them. Mr. Stamps likewise testified that he did not work on any legal matters from Mr. Locklear and simply assisted him in gathering information for a loan application.

DISCIPLINARY PROCEEDINGS

Formal Charges
After investigation, the ODC filed one count of formal charges against respondents. The charges alleged violations of Rules 5.5(a) (violating the disciplinary regulations of another jurisdiction through the unauthorized practice of law in that jurisdiction), 5.5(b) (assisting a person who is not a member of the bar in the unauthorized practice of law), 8.1(a) (knowingly making a false statement of material fact in connection with a disciplinary matter or bar admission matter), 8.1(b) (failure to respond to a lawful demand for information from an admissions and a disciplinary authority), 8.4(a) (violating or attempting to violate the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving deceit, dishonesty, fraud, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct.
Respondents answered, denying any misconduct. They also filed an exception, asserting Louisiana had no jurisdiction over their actions, which occurred in another state prior to their admission to the bar in Louisiana, and a motion to sever their cases. The committee chair referred the exception to the merits and denied the motion to sever. The case then proceeded to a formal hearing.

Formal Hearing
Respondents presented no witnesses at the hearing, nor did they testify on their own behalf, relying instead on their earlier sworn statements. The ODC likewise presented no live testimony, but submitted *118 testimony of its witnesses, all of whom resided outside of the state, by deposition or videotape.

TESTIMONY OF CAROLIN BAKEWELL
Carolin Bakewell, counsel for the North Carolina State Bar, testified it was her opinion that respondents had split fees with Mr. Locklear. In support, Ms. Bakewell noted that the checks issued by Mr. Locklear to respondents represented exactly 50% of the attorney's fees in the respective cases. She pointed out the North Carolina Disciplinary Hearing Commission specifically rejected Mr. Locklear's argument that the checks simply represented salary payments.

TESTIMONY OF BILLY RAY BLACKWELL
Mr. Blackwell testified that he retained respondents to handle six cases on his behalf. Mr. Blackwell stated they quoted a fee of $1,500 to him to handle his legal matters and that he paid Mrs. Stamps $700, and later paid an additional $400. He claimed he consulted with both Mrs. Stamps and Mr. Stamps on numerous occasions. Mr. Blackwell pointed out that Mr. Stamps had "a plaque on the desk saying `fifty dollar ($50) consultation fee.'" He further testified: "I think I paid'em fifty dollars ($50) a couple of times, because they wouldn't even talk to you unless you paid a consultation fee...." He noted that he never received receipts for the payments. Mr. Blackwell testified that he filed a complaint with the North Carolina State Bar when he concluded that work was never done on his cases. Further, he maintained he was never advised by respondents that they were not licensed to practice law in North Carolina.

TESTIMONY OF JAMES WILLIAMS
James Williams testified that in March 1999, he hired Mrs. Stamps in connection with an "accident case" against Wallace Trucking. He claimed he was referred to her by Mr. Locklear. Mr. Williams testified that he met with Mrs. Stamps directly, outside of the presence of Mr. Locklear. According to Mr. Williams, Mrs. Stamps never advised him that she did not have a license to practice law in North Carolina. Mr. Williams further denied that Mrs. Stamps ever told him she would be assisting Mr. Locklear; rather, she told him "she was gonna be the lawyer." He testified that she never indicated she would have to consult with Mr. Locklear before she did anything on the case and advised him her fee would be one-third of any recovery. Mr. Williams stated that he was unclear about the actual settlement amount because he never saw the check from the insurance company. He was paid his portion of the settlement through a check drawn on Mrs. Stamps' personal checking account.[5] Believing Mrs. Stamps was a North Carolina-licensed attorney, he filed a complaint with the North Carolina State Bar to complain about her failure to pay his medical bills pursuant to a lien held by his treating physician, Dr. A.J. Sabella of the Sabella Chiropractic Clinic.

TESTIMONY OF DR. A. J. SABELLA
Dr. Sabella corroborated Mr. Williams' testimony that Mr. Williams' medical bills had not been paid. He testified that he had forwarded requests for payment to "Lynn Stamps, Esq." When no payment was made, he filed a disciplinary complaint against Mrs. Stamps with the North Carolina State Bar, assuming she was a licensed attorney.

*119 TESTIMONY OF ROBIN CAPPS
Robin Capps, an adjuster with Royal and Sun Alliance, testified that she often spoke to Mrs. Stamps and corresponded with her. As early as November 30, 1998, Mrs. Stamps contacted her regarding the personal injury settlement of Mr. Locklear's client, Carl Oxedine. She stated she was under the impression that Mrs. Stamps was a licensed attorney, and that she was never advised otherwise.

Recommendation of the Hearing Committee
Following the conclusion of the formal hearing, the hearing committee issued its recommendation. Prior to reaching the merits, the hearing committee discussed respondents' exception, in which they asserted Louisiana lacked jurisdiction because none of the misconduct complained of occurred in Louisiana and respondents were not licensed as attorneys at the time of the alleged misconduct. In rejecting this argument, the committee observed that respondents' alleged misconduct involved failure to disclose information on applications to take the bar examination. The committee concluded they consented to jurisdiction in Louisiana by seeking admission in this state. Accordingly, the committee dismissed the exception.
On the merits, the hearing committee found the ODC proved respondents violated Rules 8.1 and 8.4 by failing to provide truthful responses in their bar applications and engaging in conduct prejudicial to the administration of justice. In particular, the committee found that by December 1998, respondents were well aware that they were going to be working for Mr. Locklear, and they should have disclosed that fact on their applications. Further, even accepting respondents' argument that they had "no employment to disclose" in December 1998, the committee pointed out they had a continuing duty to supplement their applications. In support, the committee relied on Rule 8.1(b), which states that an applicant for admission "shall not... fail to disclose a fact necessary to correct a misapprehension...."
Moreover, based on the evidence in the record, the committee found respondents were clearly employed by Mr. Locklear. It pointed out that they were paid by Mr. Locklear and cited language in the employment contract which referred to them as "employees." The committee rejected respondents' explanations to the contrary as "insincere, unconvincing, and wholly incredible."
As to the allegations of unauthorized practice of law, the committee found Mrs. Stamps engaged in the unauthorized practice of law in North Carolina, although it made no finding that Mr. Stamps had done so. Nonetheless, the committee determined it made no difference whether or not Mr. and/or Mrs. Stamps did or did not practice law in North Carolina for purposes of whether they were required to disclose their employment with Mr. Locklear on their applications to take the bar examination. The committee noted the applications require disclosure of employment, not disclosure of the practice of law.
Having found misconduct, the committee turned to the issue of sanctions. The committee concluded respondents' conduct was knowing. As aggravating factors, it recognized multiple offenses and a refusal to acknowledge the wrongful nature of the conduct. The committee identified no mitigating factors. Based on its findings, the hearing committee recommended that respondents be disbarred from the practice of law.

Recommendation of the Disciplinary Board
Following its independent review of the record, the disciplinary board adopted *120 most of the hearing committee's factual findings.
The board concurred in the committee's legal findings that respondents violated Rules 8.1 and 8.4 by failing to disclose their employment with Mr. Locklear on their applications to take the bar examination. The board determined this finding was supported by the evidence in the record, including the employment contract, letters written by Mr. Stamps regarding the Blackwell matters, testimony of the adjuster for Royal and Sun Alliance that Mrs. Stamps had been working for Mr. Locklear as early as November 30, 1998, and the testimony of Carolin Bakewell, counsel for the North Carolina State Bar, regarding the splitting of fees.
With regard to the unauthorized practice of law allegations, the board agreed with the committee's finding that Mrs. Stamps violated Rule 5.5 by engaging in the unauthorized practice of law in North Carolina. The board further determined the record supported the conclusion that Mr. Stamps also engaged in the unauthorized practice of law in North Carolina. In support, the board relied on the employment contract, the letters written by Mr. Stamps to Mr. Locklear concerning the cases he worked on and the amount of money owed by the clients in the cases, the testimony of Ms. Bakewell concerning the splitting of fees, and the testimony of Mr. Blackwell relative to his various legal matters.
Addressing the issue of an appropriate sanction, the board found that respondents violated a duty owed to their clients, the legal system and the profession, resulting in significant actual injury. The board determined their unauthorized practice of law caused inadequate and improper representation to the clients, and the disciplinary system suffered undue burden and expense because of respondents' false applications.
The board recognized multiple offenses and refusal to acknowledge the wrongful nature of the conduct as aggravating factors. As mitigating factors, it identified the lack of prior discipline and inexperience in the practice of law. Considering these factors, the board recommended that respondents be suspended from the practice of law for a period of two years.
Two board members dissented as to the leniency of the proposed sanction, finding disbarment to be appropriate under the facts.
The ODC and respondents filed objections to the disciplinary board's recommendation. Accordingly, the matter was docketed pursuant to Supreme Court Rule XIX, § 11(G)(1)(a).

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343, 348; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444, 445 (La.1992).

Procedural Issues
Prior to addressing the merits, we must consider several procedural issues raised by respondents. First, they assert this court lacks jurisdiction to consider their actions, which occurred outside of this state prior to their admission to the practice of law. Secondly, they contend that the hearing committee erred in denying their motion to sever their cases. Finally, they urge the hearing committee erred in admitting hearsay evidence. We will address these matters in turn.

*121 EXCEPTION OF LACK OF JURISDICTION
It is well settled that this court has exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the bar. Bester v. Louisiana Supreme Court Comm. on Bar Admissions, 00-1360 (La.2/21/01), 779 So.2d 715; In re Bar Exam Class Action, 99-2880 (La.2/18/00), 752 So.2d 159; Succession of Wallace, 574 So.2d 348, 350 (La.1991); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934). Pursuant to that authority, we adopted Rule 8.1 of the Rules of Professional Conduct, which places an explicit duty on an "applicant for admission to the bar" to refrain from knowingly making false statements of material fact on an application for admission and to disclose facts necessary to correct any misapprehensions arising in such a matter. The comments to Rule 8.1 provide, in pertinent part:
The duty imposed by this Rule extends to persons seeking admission to the bar as well as lawyers. Hence, if a person makes a material false statement in connection with an application for admission, it may be the basis for subsequent disciplinary action if the person is admitted...
The obvious purpose for this disclosure requirement is to provide this court with the information it needs to make an informed determination of whether the applicant possesses sufficient character and fitness to be admitted to the practice of law in this state. Information relating to an applicant's employment, especially the applicant's employment in a legal setting, is particularly relevant. Supreme Court Rule XVII, § 5(C) indicates an applicant's "misconduct in employment" and "commission of an act constituting the unauthorized practice of law" are factors to be considered in determining whether an applicant possesses the requisite character and fitness to be admitted to the bar.
Clearly, this court has jurisdiction to discipline a lawyer when it is subsequently determined the lawyer deprived this court in the bar admission process of vital information relative to whether the individual possessed the necessary character and fitness for admission. To hold otherwise would encourage applicants to withhold information during the application process. Our review of the jurisprudence of our sister states indicates they have reached similar conclusions. See Matter of Cherryhomes, 115 N.M. 734, 858 P.2d 401 (1993) (New Mexico Supreme Court indefinitely suspended an attorney who, among other things, forged a physician's signature on a certificate of fitness required by the bar application process in another state); Matter of Rosen, 570 A.2d 728 (D.C.App.1989) (nine-month suspension from practice imposed on an attorney for failure to supplement his Maryland bar application to indicate he was under investigation for professional misconduct in another state where he was admitted to practice); Matter of Scavone, 106 N.J. 542, 524 A.2d 813 (1987) (attorney disbarred for falsely indicating on his bar application that he had never been subjected to disciplinary action or asked to withdraw from an educational institution, when the attorney was removed from a law school); In re: Chandler, 161 Ill.2d 459, 204 Ill.Dec. 249, 641 N.E.2d 473 (1994) (three-year suspension imposed on an attorney who failed to disclose on her bar application that she provided false information on a mortgage loan application, as well as misstated her social security number in her bar application); State ex rel. Oklahoma Bar Ass'n v. Flanery, 863 P.2d 1146 (Okla.1993) (disbarment imposed on an attorney for embezzlement of $71,000 from family members prior to admission to the bar); Office *122 of Disciplinary Counsel v. Zdrok, 538 Pa. 41, 645 A.2d 830 (1994) (attorney suspended for six months for pre-admission conduct of criminal loitering).
Accordingly, we see no merit to the exception of lack of jurisdiction and therefore deny it.

MOTION TO SEVER
Mr. and Mrs. Stamps assert the hearing committee erred in failing to grant their motion to sever the cases against them. They contended there was a possibility of confusion if the evidence against them was heard at the same time.
The ODC opposed the motion to sever, arguing that Mr. and Mrs. Stamps were charged together because they acted together in a common scheme. The ODC suggested the evidence in the case would not be complex and the hearing committee would have no difficulty determining whether a witness was referring to individual actions taken by Mr. Stamps or Mrs. Stamps.
The hearing committee denied the motion to sever. Mr. and Mrs. Stamps now seek review of that ruling.
As a threshold matter, we note that the Stamps were well aware that they were charged together at the time of the filing of the formal charges on April 16, 2001. Notwithstanding, they did not file their motion to sever until September 10, 2001, over five months later and less than three weeks before the hearing was set to commence.
Turning to the merits of the motion, we find no indication from the record that Mr. and Mrs. Stamps were prejudiced in any way as a result of the joint hearing. Mr. and Mrs. Stamps did not present antagonistic defenses; indeed, both were represented by the same counsel throughout these proceedings. The record reveals the witnesses clearly distinguished the actions of Mr. and Mrs. Stamps in their testimony. Likewise, the hearing committee and disciplinary board drew distinctions between the two in their reports. Thus, there is no support in the record for the conclusion that the joint hearing created any confusion.
In sum, we find respondents have produced no evidence of prejudice which would have required a severance of the charges against them. Accordingly, the motion to sever was properly denied.

EVIDENTIARY ISSUES
Respondents argue the hearing committee erred in considering various evidence which they contend are subject to hearsay objections. Specifically, respondents object to certain unauthenticated records, as well as evidence and the findings of fact in Mr. Locklear's disciplinary case.
In response, the ODC asserts that the documents are not inherently unreliable since they were either admitted in the North Carolina disciplinary proceedings, produced from insurance company files, or submitted by respondents themselves. The ODC further points out that respondents did not object to the admission of many of these documents, or objected with the assertion that they would explain these matters in their testimony.
In general, disciplinary proceedings are subject to the provisions of the Code of Evidence. Supreme Court Rule XIX, § 18(B). However, in In re: Quaid, 94-1316 at p. 8, n. 2 (La. 11/30/94), 646 So.2d 343, 348, we observed that the unique position of this court as trier of fact in disciplinary proceedings lessened the need for strict application of those provisions of the Code of Evidence such as hearsay, which were primarily intended to govern jury trials:
We note, however, that the purpose of rules of evidence primarily intended to *123 govern jury trials, particularly the hearsay rules, are less compelling in the context of imposing discipline on members of the legal profession. This Court retains power to determine the ultimate question of admissibility under its original jurisdiction as the triers of fact in disciplinary proceedings, and it may well be more appropriate in disciplinary proceedings to be guided but not confined by strict application of the Code of Evidence. See In re: Huddleston, 595 So.2d 1141, 1148 (La.1992) (concurring opinion). We observe that such an approach has been taken in other jurisdictions. See, e.g., In re Kennedy, 605 A.2d 600, 603 (D.C.App.1992); The Florida Bar v. Vannier, 498 So.2d 896, 898 (Fla. 1986); Werner v. State Bar, 24 Cal.2d 611, 150 P.2d 892, 893-94 (1944).
Unlike a lay jury, this court, in its role as trier of fact in disciplinary cases, has the ability to consider the entire record and evaluate and weigh the probative value of evidence based on the totality of the circumstances. Considering the record as a whole, we find the hearing committee did not err in admitting the disputed evidence.

Factual and Legal Findings
Having disposed of the procedural objections, we now review the record to determine if the charges against respondents have been proven by clear and convincing evidence. The critical issue for purposes of our inquiry is whether respondents were employed by Mr. Locklear, such that their failure to disclose this employment resulted in a violation of Rule 8.1.
Respondents have repeatedly denied that they were employed by Mr. Locklear, asserting that they were never paid by him. The hearing committee found this defense to be "insincere, unconvincing, and wholly incredible."[6] Based on the overwhelming evidence of employment in the record, we find the committee's assessment to be entirely accurate.
In addition to the employment contract with Mr. Locklear, which is signed by both Mr. and Mrs. Stamps, the record contains copies of six checks issued by Mr. Locklear to Mr. Stamps, three checks issued by Mr. Locklear to Mrs. Stamps, and one check issued by Mr. Locklear to respondents jointly. With one exception, each of the checks bears a notation indicating it was payment for a client matter.
Additionally, the ODC produced copies of correspondence written by Mr. Stamps to Mr. Locklear, in which he stated that "while employed as associates with your firm, we worked on six cases for Billy Blackwell." This correspondence was corroborated by testimony from Mr. Blackwell, who stated unequivocally that he consulted with both Mr. and Mrs. Stamps regarding legal matters.
Considering the overwhelming evidence, it simply flies in the face of logic and common sense for respondents to assert that they did not believe they were employed by Mr. Locklear. Respondents' failure to disclose their employment with Mr. Locklear on their bar applications or supplement their applications to reveal it leads to the inescapable conclusion that they knowingly sought to withhold this information from this court.
*124 We further find that the record convincingly demonstrates that respondents' failure to disclose their employment prevented this court from obtaining access to information which had a significant bearing on their character and fitness-namely, whether they engaged in the unauthorized practice of law while working in the law office of Mr. Locklear. The evidence suggests an investigation would have clearly revealed both Mr. and Mrs. Stamps engaged in the unauthorized practice of law in North Carolina.
With regard to Mr. Stamps, as noted earlier, the record contains copies of five checks issued to him by Mr. Locklear, four of which contain notations relating to fees for client matters. Mr. Blackwell testified that he met with Mr. Stamps concerning legal matters and was led to believe that Mr. Stamps was an attorney. Mr. Stamps' own correspondence to Mr. Locklear identifies Mr. Stamps (and his wife) as "associates with your firm" and discusses work done on Mr. Blackwell's legal matters.
As to Mrs. Stamps, the testimony of Mr. Blackwell, Mr. Williams, Ms. Capps, and Dr. Sabella all demonstrate that Mrs. Stamps gave the clear impression that she was a licensed attorney. The record includes correspondence drafted and signed by Mrs. Stamps on behalf of Mr. Locklear's law firm. These letters identify Mrs. Stamps as "Esq.," a title commonly used by lawyers.
In summary, based on the overwhelming evidence, we conclude that in connection with the bar application process, respondents knowingly concealed from this court information relating to their employment. This failure to disclose prevented this court from discovering information regarding their unauthorized practice of law in another state, an issue which has a critical bearing on their character and fitness.

Sanctions
Having found professional misconduct, we now turn to a determination of the appropriate sanction for this misconduct. In addressing the issue of sanctions, we are mindful that the purpose of disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain the appropriate standards of professional conduct, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. In re: Vaughan, 00-1892 (La.10/27/00), 772 So.2d 87; In re: Lain, 00-0148 (La.5/26/00), 760 So.2d 1152. The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. In re: Redd, 95-1472 (La.9/15/95), 660 So.2d 839.
It is difficult to understate the seriousness of the misconduct in this case. Through their knowingly deceitful actions, respondents have sought to frustrate this court's ability to make an informed determination of their character and fitness prior to admitting them to the bar of this state. Their actions impede the fundamental responsibility of this court to assure the protection of the public and to safeguard the administration of justice. See Supreme Court Rule XVII, § 5(A); In re: Singer, 01-2776 (La.6/12/02), 819 So.2d 1017. As the Supreme Court of New Jersey observed in In re: Scavone, 106 N.J. 542, 524 A.2d 813 (1987):
Candor and honesty are a lawyer's stock and trade. Truth is not a matter of convenience. Sometimes lawyers may find it inconvenient, embarrassing, or even painful to tell the truth. Nowhere is this more important than when an applicant applies for admission to the bar.
By ignoring their fundamental duty of candor to this court at the very inception *125 of their legal career and by victimizing clients in another state, respondents have convincingly demonstrated they lack the good moral character to practice law in Louisiana. Unquestionably, the baseline sanction for such misconduct is disbarment.
As aggravating factors, we recognize the continuous refusal of respondents to acknowledge the wrongful nature of their conduct.[7] We find no mitigating factors from the record.[8]
Under these circumstances, we would be remiss in our constitutional duty to protect the citizens of this state if we did not remove respondents from the practice of law. Accordingly, we must disbar respondents.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the names of Jerry Jackson Stamps, Louisiana Bar Roll No. 26521, and Teresa LynnWitt Stamps, Louisiana Bar Roll No. 26146, be stricken from the roll of attorneys and that their licenses to practice law in the State of Louisiana be revoked. All costs and expenses in the matter are assessed against respondents in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
KIMBALL, J., concurs and assigns reasons.
KIMBALL, Justice, concurring.
I agree with the result reached by the majority in this case; however, in my view, the correspondence between Mr. Stamps and Mr. Locklear should not have been considered as evidence against Mrs. Stamps. Even under a more relaxed application of the provisions of the Code of Evidence in disciplinary matters, I believe that letters written by one defendant, Mr. Stamps, still constitute hearsay evidence that should not be used as substantive proof to implicate another defendant, Mrs. Stamps. However, absent the letters, I agree that the record presents overwhelming evidence of both Mr. and Mrs. Stamps' professional misconduct. Therefore, I concur in the result reached by the majority.
NOTES
[1] Checks issued to Jerry Stamps by Mr. Locklear:

Date Check No. Check Amt. Client Check Memo
12/5/98 3425 $438.33 Oxendine, Carl "PI Proceeds" *
12/7/98 3735 1,125.00 Ikner, Walter & Karlene "Walter/Kalene I. Fee" *
1/11/99 3792 1,050.00 Patterson, Joseph "Joseph Patterson"
1/28/99 3561 3,250.00 Moss, N. "Nola [illegible]"
4/20/99 3815 3,200.00 Unknown "Fee"
Checks issued to Lynn Stamps by Mr. Locklear:
Date Check No. Check Amt. Client Check Memo
1/13/99 3800 $ 575.00 Oxedine, Carl Notation
3/8/99 3575 750.00 None "Carl Oxedine"
1/11/99 3792 1,050.00 Patterson, Joseph "Joseph Patterson"
Checks issued to Jerry and Lynn Stamps:
Date Check No. Check Amt. Client Check Memo
12/17/98 3432 $ 500.00 Roger Goodwin Notation
 "Goodwin Proceeds"*
* Checks issued prior to the date of respondents' employment contract executed with Mr. Locklear.

[2] In a letter, dated June 10, 1999, faxed to Mr. Locklear from Mr. Stamps' fax number, Mr. Stamps wrote on behalf of himself and his wife:

As you already know, because they were discussed with you on numerous occasions, while employed as associates with your firm, we worked on six cases for Billy Blackwell.
* * *
All together, we spent a total of 50 hours on the above cases for Billy Blackwell. As you know at $90 per hour, the legal fees would amount to $4,500.
Billy knows that substantial work was done on all his cases, and you know that substantial work was done on his cases. He called us in Mississippi and asked us to take over his cases, because he said that he had picked up the files from your office. We told him we could not handle his cases because we were no longer with your firm, but that we might rejoin your firm again in July, which is what we agreed upon the last time we talked.
As you know, any money we received from anyone was always discussed with you, and Billy's case was no exception....
If Billy still wants us to represent him we would be glad to handle all of his cases if it could be worked out for us to do so. [Emphasis added.]
In another letter, dated June 19, 1999, directed to Mr. Locklear, Mr. Stamps, on behalf of himself and his wife, wrote:
To clarify, Billy Blackwell signed 3 personal injury retainer agreements. I do not think we should do these cases unless we receive money up front, so I informed Billy we needed at least $1,500.00 before we could begin doing any work on the cases.
As you should recall he phoned you and asked if he could pay in installments, and you told him it was up to me. I told Billy he would have to pay $1,500 so he then called you again and complained that we were too high and that he wanted YOU to handle his case.
* * *
I spent a GREAT deal of time on Billy's tobacco case and made numerous phone calls getting medical records,...
One last thing, Rita has called many, many times and I have sent her everything I have on her case. I will be glad to help you with her case, but has she paid? [Emphasis added.]
[3] Mr. Locklear was ultimately disbarred in North Carolina by consent. North Carolina State Bar v. Gabrielee Locklear, Attorney, 00-DHC15, Disciplinary Hearing Commission of the North Carolina State Bar.
[4] In correspondence to the ODC, Carolin Bakewell, counsel for the North Carolina State Bar, indicated that North Carolina did not pursue charges against respondents for unauthorized practice of law, noting that they had fled the state. However, Ms. Bakewell wrote:

You will find enclosed copies of our witness interviews and letters from our file regarding the Stamps' conduct, which I hope you will find helpful. It is difficult to determine which is the biggest scoundrel in this mess: Locklear or the Stamps, but it is certain that the three of them have caused a great deal of harm to the public in North Carolina.
[5] It is noteworthy that the claims adjuster issued a check on May 13, 1999 in the amount of $7,000 made payable only to "Lynn Stamps, Attorney for John Williams." Not only was Mr. Williams' name improperly written as John instead of James, he was not included as a payee on the check.
[6] For example, Mr. Stamps initially denied ever receiving a "penny" from Mr. Locklear and emphatically denied ever being given any checks by Mr. Locklear. When the ODC produced copies of the checks, Mr. Stamps then claimed these checks were simply for "travel expenses" and denied even knowing the clients listed on the checks. In the face of such glaring inconsistencies, it is difficult to find such testimony credible.
[7] Indeed, rather than acknowledging their misconduct, it appears respondents may have made deliberate misrepresentations or untruthful statements in their sworn statements.
[8] The disciplinary board recognized inexperience in the practice of law and lack of a prior disciplinary record as mitigating factors. We find absolutely no basis to consider these factors in mitigation. Respondents' inexperience has no bearing on their failure to disclose basic information on their applications to take the bar examination. Likewise, the lack of a prior disciplinary record holds little sway, considering the fact that the misconduct occurred at the very inception of respondents' legal career in this state.